[No. B080752. Second Dist., Div. Three. Sept. 14, 1995.]

AVEDIS KASPARIAN, Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Appellants.

248

---

**COUNSEL**

Bruce Altschuld for Plaintiff and Appellant.

De Witt W. Clinton, County Counsel, J. Patrick Joyce, Principal Deputy County Counsel, Riordan & McKinzie, Kenneth Klein, Gina M. Calvelli, Yacoubian & Zerunyan, Frank Vram Zerunyan, Robie & Matthai, Pamela E. Dunn, Raiskin & Revitz, Steven J. Revitz, Mitchell, Silberberg & Knupp and John L. Segal for Defendants and Appellants.

---

**OPINION**

**CROSKEY, J.**—In this appeal, the defendants and appellants, County of Los Angeles, Michael D. Antonovich, an elected member of the Los Angeles County Board of Supervisors (collectively, the County defendants), Western Jewelry Mart Joint Venture (Joint Venture), Kirkor Suri and Jak Sukyas (collectively, the WJM defendants) seek to overturn a seven-figure judgment, including both compensatory and punitive damages, entered on November 1, 1993, in favor of the plaintiff and respondent Avedis Kasparian.

Plaintiff's claim, as it went to the jury, was based on an alleged conspiracy between the County defendants on the one hand and the WJM defendants on the other to intentionally interfere with the prospective economic advantage anticipated by plaintiff from certain negotiations to resolve partnership and other disputes between plaintiff and the WJM defendants. Because we conclude that (1) such an interference tort could not legally be committed by the WJM defendants, and thus there could be no conspiracy as a matter of law, (2) there was no substantial evidence that Antonovich had the requisite knowledge or intent to commit, or conspire to commit, that same tort and (3) there was no substantial evidence that the acts of Antonovich caused the damages claimed by plaintiff, we reverse the judgment and remand with directions to enter judgment in favor of the defendants.

## Factual and Procedural Background[1]

The Joint Venture, a general partnership, was formed in 1978 to own and operate the Jewelry Mart building at 6th and Hill Streets in downtown Los Angeles. The defendants Sukyas and Suri were two of its five general partners.[2] At the time that the Joint Venture purchased the building, a restaurant occupied part of the ground floor. Shortly after the Joint Venture purchased the building the restaurant sold its leasehold interest to plaintiff.[3]

The lease was then renegotiated and the restaurant space was converted to 36 sales booths (measuring between 70 and 100 square feet each) which were in turn subleased by plaintiff to various retail jewelers. Plaintiff's leased portion of the ground floor of the Jewelry Mart building (about 3,600 square feet) became known as Plaza II. The remaining portion was known as Plaza I and the Joint Venture, as lessor, leased similar booths in that space to retail jewelers. This resulted in the ground floor of the building (about 8,000 square feet) being devoted to retail jewelry businesses. The other 11 floors of the 12-story building were leased to wholesale jewelers.

At some point prior to May of 1980, a dispute arose between the Joint Venture and plaintiff over the payment of his rent obligations under the lease. This dispute was ultimately resolved on May 1, 1980 by the formation of a limited partnership known as the Plaza II partnership (Plaza II). The Joint Venture was the general partner and plaintiff was the limited partner. The purpose of the partnership was to manage the business, renting the 36 jewelry booths. The Joint Venture had the responsibility under the partnership agreement for managing the business, renting the spaces, collecting rent, providing maintenance and upkeep, paying all expenses and dividing the net revenue. Plaintiff had no management responsibilities but he was entitled to 50 percent of the net revenue and all "key money" paid by

---

[1]The recitation of facts upon which we rely is based upon the *substantial evidence* presented to the jury and, as required by settled principles of appellate review, viewed in the light most favorable to the plaintiff.

[2]However, in 1979 Suri was replaced as a general partner in the Joint Venture by S & G Investment, a family limited partnership in which he was one of the general partners.

[3]This is not precisely accurate but is an editorial device we adopt in order to present the relevant facts in the simplest manner. In actual fact, the restaurant's leasehold interest was purchased by a partnership known as the A.L.N. Joint Venture (ALN) in which plaintiff and one other were the general partners. While the record is not entirely clear, it appears that the entire partnership interest in ALN ultimately was acquired by plaintiff. For convenience, and because it is adequate for our purposes, we refer to plaintiff as the sole successor in interest to the restaurant leasehold.

tenants.[4] Plaza II was to last until May 31, 1999, the date of the termination of the master lease between plaintiff and the Joint Venture.

At the inception of Plaza II's operations it produced only enough revenue to pay plaintiff about $2,000 per month. However, by 1988, the year most relevant to our concerns, plaintiff was being paid, as his share of the net revenue, between $20,000 and $25,000 per month. Under the terms of the partnership agreement plaintiff, upon the termination of Plaza II, would receive nothing, as the partnership's only asset was the leasehold interest to a portion of the ground floor of the Jewelry Mart building.

For a time Plaza II was very successful. In the early 1980's there were relatively few jewelers compared to the demand. However, by 1991 this had changed as more and more jewelry plazas opened in the downtown area. Business dropped, leases expired and profits diminished. The testimony at trial reflected that a recession had hit the jewelry business by the end of the 1980's from which it had not recovered by the time of the trial of this action.

Another dispute arose in 1982 between the Joint Venture and plaintiff over monies allegedly due to plaintiff for construction work and expenses incurred in connection with the conversion of the restaurant space into 36 jewelry booths. Plaintiff filed suit and, after a summary judgment in favor of the Joint Venture was reversed on appeal, the case went to trial in August of 1988 (the construction case). Judgment was entered in plaintiff's favor on November 16, 1988 for $247,000 (the construction judgment). This judgment was ultimately paid in 1991 after it was affirmed on appeal in February of that year.

In March 1988, before the construction case went to trial, plaintiff filed another action against the Joint Venture arising out of still another dispute over the management and operation of Plaza II (the partnership case). Plaintiff claimed that the Joint Venture had misappropriated funds belonging to Plaza II and he sought an accounting, the appointment of a receiver and damages. He did not seek dissolution of Plaza II nor did he seek any remedy which would have forced the Joint Venture to buy out his interest in that partnership. The Joint Venture cross-complained against plaintiff seeking money damages for his alleged interference with its ability to refinance the Jewelry Mart building.

---

[4]In the early 1980's jewelry booth space was very scarce and in high demand. To get a booth, jewelers were willing to pay, in addition to a rental, an agreed sum called "key money," so they could get a lease. Key money was used to pay for building out the booths. At that time, the key money for the best locations was between $10,000 and $15,000 per booth.

While certain law and motion matters were pending, the assigned trial judge (the Hon. Eric Younger) ordered the parties into a settlement conference with retired Justice Robert Feinerman. They had two meetings with him, one on October 14, and the other on October 19, 1988. Prior to the first conference, the Joint Venture had determined to resolve the entire matter by offering to buy out plaintiff's interest in Plaza II. At the October 14 conference they offered to pay $1.8 million to plaintiff. He rejected this offer and demanded $3 million. This counteroffer was unacceptable to the Joint Venture.

At the October 19, 1988 meeting, the Joint Venture raised its offer to $2 million, which was intended to resolve the partnership case and the then anticipated construction judgment as well. Plaintiff again rejected this offer and demanded $3 million. The attorney representing plaintiff at that time suggested that the Joint Venture structure its offer in such a way that a larger portion of the payment could be allocated to plaintiff's personal injury damages (i.e., emotional distress) so that the income tax consequences to both parties would be such as would enable them to reach a settlement. This proposal was ultimately rejected by the Joint Venture apparently because of concerns as to its legality.

Plaintiff seemed to testify at trial that an agreement was reached to buy out his interest in Plaza II for $2.5 million, subject to the approval of the accountants. However, we are uncertain what to make of this claim. In his testimony, plaintiff indicated that this was to be *net* to him (which is more consistent than inconsistent with a $3 million gross settlement).[5] Moreover, in his own pretrial deposition testimony and answers to interrogatories,

---

[5]The reporter's transcript reflects the following testimony by plaintiff:

"Q. Mr. Kasparian, is it your testimony there was a $2.5 million offer on October 19th, 1988?

"A. Yes.

"Q. Did you accept or reject that offer?

"A. Yes, I did accept.

"Q. You accepted it?

"A. Yes, after we was going to go and see the accountant.

"Q. Did you accept?

"A. Yes, I was. *If it was some of the tax deductible*, yes, I did.

"Q. Did you communicate to—through your attorney or by yourself to the W.J.M. Partners that you accepted the $2.5 million offer on that date?

"A. Yes, We did shake hand.

"Q. And that was a deal?

"A. A deal.

". . . . [¶] . . . .

"Q. What were you willing to accept as a settlement at the Younger settlement conference on November 4th 1988—Excuse me—What were you willing to accept for settlement?

plaintiff denied that any settlement had been made; and the testimony of all other witnesses negated the making of any such agreement. When the parties appeared in front of Judge Younger for a mandatory settlement conference on November 4, 1988, nothing was said about an agreement; indeed, the lack of a settlement prompted the setting of a trial date at that time. At oral argument in this appeal, plaintiff's counsel denied that any "firm or formal" agreement had ever been made to buy out plaintiff's interest in Plaza II. Actually, one of his legal arguments before this court is inconsistent with any contention that he had a contract with the Joint Venture for a buy-out of his partnership interest.[6]

On November 4, 1988, Judge Younger determined that the case had not been settled by Justice Feinerman's efforts. He therefore set the trial date for November 28, 1988. The parties appeared in Judge Younger's courtroom on that date ready to go to trial. However, due to the court's congested calendar, the case trailed for several days. On December 2, Judge Younger continued the trial to February 27, 1989.

Sometime in late October or early November 1988, but after the second settlement conference on October 19, Suri, who was a financial and political supporter of Antonovich, telephoned him to arrange a luncheon meeting with the several Joint Venture partners, including the WJM defendants. There was evidence that it was about this time that Suri had advanced $10,000 to purchase two tables at a fund-raising event being held for Antonovich, who

---

"A. As is suggested by Justice Feinerman.

"Q. Isn't it true, sir, that you were determined to get $3,000,000 at that settlement conference, too?

"A. I told always I am going to get less than $3,000,000, but I was determined for $3,000,000, Yes, Sir.

"Q. Didn't you tell Judge Younger on November 4th, 1988 that you were determined for $3,000,000?

"A. Yes, but I didn't got the answer, you know, as the Justice Feinerman suggested yes.

"Q. Yet, Sir, you accepted a $2.5 million offer subject to people checking with their Tax Accountants on October 19th 1988?

"A. Sure, I take every penny, you know, *it's clear to my pocket*. They suggested, you know, it's going to be two million five, and that's why I thought, you know, it's good deal to take it." (Italics added.)

[6]Plaintiff's position is that the defendants' conspiratorial acts were intended to interfere with a *prospective* economic advantage, not with an existing contractual relationship. Such an argument necessarily assumes that no agreement on the buy-out of his Plaza II partnership interest had been reached. Indeed, plaintiff's position at trial was that there was no contract or contractual relationship which could be the subject of an interference tort. It was the claimed interference with plaintiff's prospective economic advantage which was the basis for plaintiff's claim.

was then running for reelection to his supervisorial seat.[7] The luncheon was scheduled for and held on November 17, 1988, about 10 days after the election at which Antonovich had been reelected. The evidence is clear that there was only one such luncheon meeting and that it was held on that date.[8]

During the luncheon meeting Antonovich and the several Joint Venture partners discussed a number of topics and spent a few minutes discussing the partnership case and the fact that a trial before Judge Younger was already scheduled.[9] The buy-out negotiations were not

---

[7]Suri testified that after he had sold the tickets for the two tables and forwarded the $10,000 he had collected to Antonovich, his earlier $10,000 advance was returned.

[8]We note that here, because plaintiff argues that there was an earlier luncheon meeting in October at which time the conspiracy which is at the heart of his case was formed. However, there is no substantial evidence in the record to support the claim of an earlier meeting. The WJM defendants all testified that there was only one meeting and Suri produced a credit receipt which established the date as November 17. Plaintiff's argument that there were two meetings was based on the fact that Antonovich could not remember the date and conceded the possibility that it (i.e., *the* meeting) might have occurred in October. However, there is *no evidence* of more than one meeting; *all* of the evidence is to the contrary. Indeed, at oral argument plaintiff conceded that as of October 31, 1988, the parties were still negotiating with respect to the proposed buy-out of plaintiff's interest in Plaza II. If that is the case, then plaintiff must also necessarily concede that this luncheon meeting between Antonovich and the WJM defendants had to have occurred in the month of November. It has been plaintiff's consistent position that it was only *after* the luncheon meeting with Antonovich that the WJM defendants terminated the buy-out negotiations.

[9]Antonovich testified as follows regarding this meeting:

"Q. With regard to this meeting before the telephone contact with Judge Younger, do you recall who set up the meeting?

"A. No. I don't. It was a call to my office. Either I had received the call or my secretary received a call and we arranged a lunch.

"Q. And where was the lunch meeting?

"A. At the Biltmore Hotel.

"Q. And is that where you went to the lunch?

"A. Yes.

"Q. Did you go to the Western Jewelry Mart premises first?

"A. I don't believe so. I believe I went directly to the restaurant.

"Q. Okay. And do you recall what the purpose of the meeting was? Was that explained to you?

"A. No. We just had a—we had a luncheon.

"Q. And who was at that luncheon, Sir?

"A. Mr. Suri, Mr. Madilian, Mr. Sukyas.

"Q. And was the lawsuit discussed that they were involved in at that time? Was there a lawsuit discussed at that lunch meeting, Sir?

"A. It was mentioned in the gist of the conversation that there was a litigation or decision that was going to be made.

"Q. And it was told to you that a decision was going to be made by Judge Younger; is that correct?

"A. Yes.

"Q. And did you tell the gentlemen at that lunch meeting that you knew Judge Younger?

mentioned.[10] Antonovich stated that he knew Judge Younger and there was some discussion about the value of a character reference which might be provided to the judge. Another $3,000 contribution was made to Antonovich on November 17, although it was not personally given to him at the luncheon.

"A. I don't know if I told him that I knew the judge in the discussion. We discussed a number of issues. We discussed political issues, social issues, community issues; and so it's possible, but I don't recall that.

"Q. Okay. And did they explain to you at that lunch meeting that there was a lawsuit pending against them by their partner?

"A. It was in the conversation indicated that there was—a decision was being made on this, an agreement or disagreement with one of their partners.

"Q. Okay. And how did you respond to that, Sir?

"A. I listened.

"Q. And did you tell them that you would attempt to contact Judge Younger for them?

"A. There was no direct say [sic] contact the Judge and intervene on our behalf, No.

"Q. What was discussed then?

"A. Just that there was litigation, a decision was going to be made and that they were, you know, good community people and they had—they had some concerns that—with the system. And, you know, coming from a community where they are new to America, they don't speak the language as their first language and, you know, I can relate to that, to a family who has come from Croatia who have had similar inabilities to or difficulties in becoming simulated [sic] to the community. You know, I thought they had—they had a legitimate concern.

"Q. And they expressed that concern to you?

"A. Yeah.

"Q. And was their concern that they thought they were not going to get treated fairly?

"A. I think there was a concern just that, you know, somebody could give a character reference that they were hard working, honest people.

"Q. And did the fact that the person that was suing them come up at all, that he was also a hard working person? Did they discuss that with you at all?

"A. No. It was just a conversation which involved other conversations from the governor's elections and the president to international affairs. So it was just a—I don't recall all the nature of the conversation except this was a part of a long series of discussions that we had.

"Q. Had you heard before that they had been involved with—in a lawsuit with this particular partner?

"A. No.

"Q. Were you aware at the time that Judge Munoz had issued a judgment [i.e., the construction judgment] against them?

"A. No.

"Q. Have you learned that since?

"A. No."

[10]As we explain below, the question of whether Antonovich had any knowledge of the buy-out negotiations is critical to plaintiff's case. If the object of the conspiracy, *as it necessarily had to be*, was to interfere with the successful completion of those negotiations, then Antonovich had to have knowledge of them in order to possess the requisite intent to be a party to the conspiracy or to commit the tort of intentional interference. There is no substantial evidence in the record to show that he had such knowledge. The trial court recognized this fact on the record when it denied defendants' new trial motion. However, the court nonetheless charged Antonovich with that knowledge because it was known to his "co-conspirators." As we also explain, this was error.

After the luncheon meeting, Antonovich called Judge Younger but did not reach him. On November 21, 1988, Judge Younger returned the call and they had a brief discussion in which Antonovich mentioned the case and referred to the defendant Suri as a hardworking family man who was an honest person.[11, 12]

---

[11]Antonovich recalled this telephone conversation in the following testimony. In response to a question from plaintiff's counsel, he stated:

"A. I mentioned to Judge Younger that I knew Mr. Suri. That's who I was familiar with. And I mentioned that Mr. Suri had come up the hard way and was a hard working family man who I think did exceptionally well for having, you know, problems of reading English and that [sic] and able to come here and through hard work and perseverance raise a family and be involved in the community.

"Q. And do you know when Mr. Suri came here?

"A. He came here—

"Q. Do you know how old he was when he came here?

"A. I thought he was about 13 years old when he came here.

"Q. Okay.

"A. But—

"Q. You now know otherwise?

"A. I understand he came a little bit later. But still, anyone who comes here from the oppression in Turkey and not having the educational opportunities and doing well I admire.

"Q. Did you ever ask if Mr. Kasparian was somebody who came up the hard way at this meeting?

"A. No.

"Q. Do you have any knowledge if he did or didn't?

"A. I do not know Mr. Kasparian.

"Q. Have you been told that Mr. Kasparian resides in your district?

"A. No.

"Q. What did Judge Younger say in response to your remark that Mr. Suri came up the hard way?

"A. When I talked to Eric I said to stop me if this is not correct, but I had a reference call on an individual that I had known. He said, okay, go ahead. And I said there was a case with a decision and that I had known Mr. Suri and it was basically like a 30-second conversation and we stopped talking about that and talked about family and some other issues. [¶] So that's about as far as I got, just to say that he was, you know, a new American who came up the hard way and he was an honest person."

[12]Judge Younger recalled this same conversation in the following testimony under direct examination by defendants' counsel:

"Q. . . . . When you made phone contact with Mr. Antonovich on November 21st or 22nd, what was the first statement Mr. Antonovich said to you?

"A. I think the first thing was probably some social chitchat, how have you been, how's the family, that kind of thing. I'd never in a million years remember specifically what. I could almost certainly tell you we were just back from a trip where we didn't go with them, [sic] but my folks were also there in Brazil, and it would be extraordinary that I would not have said, well, I just was with my folks in Brazil last week. I'd take money on that. I'm sure I said that.

"Q. At some point was the conversation transformed into a conversation about the case that was before you?

"A. Yes, although—of course, I didn't know it when the transformation was occurring.

"Q. What did he say before the transformation occurred?

After reflecting on this discussion with Antonovich, Judge Younger recused himself from the trial of the partnership case on January 11, 1989. As a result, the case was transferred to a different judge and a new trial date of May 15, 1989 was assigned. Before that trial could take place the Joint Venture retained new counsel who advised the pursuit of arbitration (under the arbitration provision in the Plaza II partnership agreement). Although a motion to arbitrate was denied by the trial court, Division Five of this court later issued a writ of mandate. However, plaintiff never attempted to arbitrate and the case was ultimately dismissed in the fall of 1993 for a failure to prosecute.

While all of this was going on, three more things of importance took place. Plaintiff continued to receive his partnership distributions from Plaza II. During the period November 1988 through May of 1991, he received over $620,000 in income he would not have received had he sold his interest in

---

"A. He said something like, I hope this isn't improper for me to talk to you about this, but—and I think I interrupted him kind of laughingly and said, 'Well, if it's improper, I'll hang up on you' is what I think I said.

"Q. And what did he then say about the case before you?

"A. This certainly isn't word for word.

"Q. I understand.

"A. He said something to the effect of I understand you're the judge in the case involving Western Jewelry Mart. He may have identified it by some party names. Which would have also identified the case since I had talked to them all fairly recently. But somehow I became aware it was this case, however he said it. [¶] I just wanted to tell you that—whether he said Mr. X or the people on one side or those guys—how he identified the people that he was calling on behalf of, I don't recall. I wanted to tell you that they are good people and they're good hard working citizens and up the hard way from the old country. Something such as that. [¶] And I don't want to be cute. I know he identified who he was talking about, I just don't remember how he did.

"Q. Did he say anything else about them, that you can recall?

"A. Good, hard working, up the hard way, from the old country. I don't think he did.

"Q. Did he discuss any of the details about the litigation before you at all?

"A. No.

"Q. Buy out negotiations?

"A. No.

"Q. Approximately how long was the discussion you had with Mr. Antonovich about the Western Jewelry Mart case?

"A. Thirty-five, forty seconds maybe. If that. I mean—I don't know.

"Q. How long was the whole conversation regarding discussion of family, et cetera, if you recall?

"A. That resumed after this, of course.

"Q. This was somewhere in the middle?

"A. Early middle.

"Q. Okay.

"A. The whole call was, I don't know, five, six minutes. Obviously I wasn't keeping time. I didn't have any reason to pay much attention, you know."

Plaza II to the Joint Venture as a result of the unsuccessful buy-out negotiations. Second, on October 2, 1989, plaintiff filed this action against the county,[13] Antonovich, and the WJM defendants. Finally, on May 15, 1991, plaintiff agreed to and did sell his interest in Plaza II to the Joint Venture for the total sum of $800,000.[14]

In his original complaint, plaintiff alleged two causes of action: (1) intentional interference with prospective economic advantage and (2) conspiracy to commit a civil wrong. After various law and motion proceedings and repleading and partial dismissals filed by plaintiff, he wound up with a second amended complaint which contained a single cause of action for conspiracy to commit the civil wrong of intentional interference with prospective economic advantage. This is the claim which went to the jury.[15] The case was tried in three phases: (1) whether or not there was an economic relationship with probable favorable consequences and whether or not the defendant (Antonovich) knew of the existence of that relationship and took steps that interfered with it; (2) whether or not any economic relationship was actually interfered with and what, if any, damages were caused; and (3) whether plaintiff is entitled to punitive damages and, if so, how much.[16] After plaintiff had rested on the first phase, and the trial court denied

---

[13]Prior to filing the action, plaintiff filed a claim pursuant to Government Code section 910 which was rejected by the county. In that claim he sought unknown damages (which he described as "costs") due to the delay in the partnership case which resulted from Antonovich's telephone call to Judge Younger. As a result of Judge Younger's recusal, the trial of the partnership case was continued from February 27, 1989 to May 15, 1989. The county argues that this claim did not provide adequate notice of the cause of action which ultimately was pursued and which went to the jury and therefore there was a failure to comply with the California Tort Claims Act. Although both sides devote a substantial portion of their briefs to this issue, we have no need to reach or discuss it in view of our disposition of the matter.

[14]It appears that this reduced price was a function, at least in part, of the general depression in the Los Angeles jewelry trade, which we have previously described, and the fact that the master lease, which was Plaza II's only asset, had only eight years remaining. In addition, plaintiff retained the right to proceed with his damage claim in this action.

[15]Three weeks prior to trial, the court granted defendants' motion for summary adjudication "regarding the claim for damages for interference with the speedy collection of the [construction] judgment." The court concluded that since the judgment was paid along with costs, attorney fees and interest, there was no basis to conclude that Antonovich's phone call of November 21, 1988, to Judge Younger caused any harm to plaintiff which was not fully compensated by such fees, costs and interest. Plaintiff raises no objection to that ruling in this appeal.

[16]Just before trial, on September 23, 1993, the County defendants reached an agreement with plaintiff which was reduced to a stipulation; those defendants agreed that Antonovich "was in the scope and course of employment" with the county at the time of the acts alleged in the complaint and that the county "will not contend at trial that defendant Antonovich was acting in his individual capacity at the time of the alleged acts." In exchange for that concession, plaintiff agreed to strike the words "in his individual capacity" from the second amended complaint, and promised that he would "not contend at trial that defendant

defendants' motion for a nonsuit, the jury returned a verdict imposing liability against Antonovich for intentionally interfering with prospective economic advantage and against all defendants for conspiring to interfere with prospective economic advantage.[17] In the second phase, the jury awarded $1,205,000 in compensatory damages[18] and found that the WJM defendants had acted with oppression and malice. Finally, in the third phase, the jury awarded punitive damages against the Joint Venture in the amount of $146,000, against Sukyas in the sum of $578,400 and against Suri in the sum of $385,600.

After denial of defendants' posttrial motions for judgment notwithstanding the verdict and for a new trial, the defendants filed this timely appeal.

---

Antonovich was acting in his individual capacity at the time of his alleged acts." Plaintiff also agreed to dismiss his punitive damage claims against Antonovich.

[17]In phase I, the jury was asked and answered the following six specific questions:

"Question No. 1: At the time of Defendant Antonovich's phone conversation with Judge Younger, did the economic relationship existing between plaintiff Kasparian and any such other defendant include a probable future economic benefit or advantage to plaintiff?

"Answer: *Yes*

"Question No. 2: At the time of Defendant Antonovich's phone conversation with Judge Younger, did Defendant Antonovich know of the existence of the economic relationship?

"Answer: *Yes*

"Question No. 3: Did Defendant Antonovich intentionally engage in acts or conduct designed to interfere with or disrupt the economic relationship, if any, between plaintiff Kasparian and defendants Sukyas, Suri and Western Jewelry Mart Joint Venture?

"Answer: *Yes*

"Question No. 4: Did Defendant Antonovich's acts or conduct actually interfere or disrupt the economic relationship between Plaintiff Kasparian and Western Jewelry Mart Joint Venture and its named partners?

"Answer: *Yes*

"Question No. 5: Did the acts or conduct of Defendant Antonovich cause damage to plaintiff?

"Answer: *Yes*

"Question No. 6: Was there a civil conspiracy between Michael Antonovich and Jak Sukyas, Kirkor Suri or Western Jewelry Mart Joint Venture *to interfere [sic] a prospective economic advantage* with plaintiff Kasparian?

"Answer: *Yes*"

[18]*It appears that the amount of the compensatory damages represents the difference* between the $2 million which the WJM defendants had offered to plaintiff in October of 1988 for his partnership interest and the $800,000 which they ultimately paid him in May of 1991. The trial court rejected the argument of the WJM defendants that this award ignored the $620,000 in partnership distributions paid to plaintiff during this same period, a sum he would not have received had the buy-out of his interest occurred in 1988. The WJM defendants raise this ruling as error on appeal. Again, in view of our disposition of the matter, we need not reach or discuss the issue.

## CONTENTIONS

The principal contentions raised by the defendants are that (1) conspiracy to commit a civil wrong cannot be shown without evidence that such wrong was actually committed, (2) it is a legal impossibility for the WJM defendants to have interfered with their own economic relationship with the plaintiff, (3) the WJM defendants could not be found liable for conspiracy to commit a tort for which they could not legally be held liable, (4) for the same reason, the County defendants could not conspire with the WJM defendants to commit that tort and (5) there is no evidence that the County defendants committed the tort of intentional interference with prospective economic advantage in that at least two essential elements of that tort were not proven: (a) that Antonovich knew of the buy-out negotiations (i.e., the economic relationship he *necessarily* had to have disrupted) and intended, by his actions, to disrupt those negotiations and (b) that but for his interference there was a reasonable probability that the buy-out negotiations would have concluded to plaintiff's advantage.[19] Based on these arguments, defendants contend they are entitled to judgment as a matter of law.[20] The plaintiff disputes each of the defendants' arguments and asks us to affirm the judgment in its entirety. Plaintiff, by his cross-appeal, also seeks reversal of the trial court's order denying him prejudgment interest on his judgment.[21]

## DISCUSSION

### 1. *Standard of Review*

This case comes to us upon a jury verdict in which very specific determinations were made. ■ "[T]he scope of our review begins and ends with the determination whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, which will support the conclusions reached by the jury. [Citations.] In reviewing the voluminous record, we must examine all factual matters in the light most favorable to the prevailing parties and resolve all conflicts in support of the judgment. [Citations.] [¶] 'Substantial' evidence, however, is not synonymous with 'any' evidence. To constitute sufficient substantiality to support the verdict, the evidence must

---

[19]As already noted, the defendants raise a number of other contentions, both procedural and substantive, but in view of our conclusion that each of these five arguments has merit and are fully dispositive of the appeal, we have no need to discuss any of the other points raised.

[20]These same legal arguments were unsuccessfully asserted by the defendants in motions for summary judgment, in their trial briefs and in their posttrial motions for judgment notwithstanding the verdict and a new trial.

[21]Because we have concluded that a reversal of the judgment is required, we have no need to consider plaintiff's cross-appeal of the trial court's refusal to award prejudgment interest on the judgment.

be 'reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54]; [citations].)" (*Kruse* v. *Bank of America* (1988) 202 Cal.App.3d 38, 51-52 [248 Cal.Rptr. 217].) "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. [Citations.]" (*Edison Co.* v. *Labor Board* (1938) 305 U.S. 197, 229 [83 L.Ed. 126, 140, 59 S.Ct. 206].) " '[I]mprobable conclusions drawn in favor of a party litigant through the sanction of a jury's verdict will not be sustained where testimony is at variance with physical facts and repugnance is material and self evident.' " (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54], quoting from an Arkansas case.)

As we shall discuss, there are conclusions and inferences upon which plaintiff necessarily relies to justify his claim against the defendants which simply are not supported by this record. "While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citations.]." (*Kuhn* v. *Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 [29 Cal.Rptr.2d 191].)

## 2. *Nature of the Tort of Intentional Interference With Prospective Economic Advantage*

To resolve this case we must first understand and apply the controlling principles applicable to the tort of interference with prospective economic advantage. ■ The elements of that tort are: "(1) an economic relationship between [the plaintiff and some third person] containing the probability of future economic benefit to the [plaintiff], (2) knowledge by the defendant of the existence of the relationship, (3) intentional acts on the part of the defendant designed to disrupt the relationship, (4) actual disruption of the relationship, [and] (5) damages to the plaintiff proximately caused by the acts of the defendant." (*Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 827 [122 Cal.Rptr. 745, 537 P.2d 865].)

■ It seems clear that this tort is the broader of the two so-called interference torts. The other is interference with contract.[22] The latter is merely a species of the former. The principal difference between them is that "the existence of a legally binding agreement is not a *sine qua non* to the

---

[22]The tort of "interference with contractual relations has its roots in the tort of 'inducing breach of contract.' " (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36

maintenance of a suit based on the more inclusive wrong." (*Buckaloo* v. *Johnson, supra,* 14 Cal.3d at p. 823.) "Both the tort of interference with contract relations and the tort of interference with prospective contract or business relations involve basically the same conduct on the part of the tortfeasor. In one case the interference takes place when a contract is already in existence, in the other, when a contract would, with certainty, have been consummated but for the conduct of the tortfeasor. . . . Rather than characterizing the two as separate torts, the more rational approach seems to be that the basic tort of interference with economic relations can be established by showing, *inter alia,* an interference with an existing contract or a contract which is certain to be consummated, with broader grounds for justification of the interference where the latter situation is presented." (*Builders Corporation of America* v. *United States* (N.D.Cal. 1957) 148 F.Supp. 482, 484, fn. 1, revd. on other grounds (9th Cir. 1958) 259 F.2d 766, see also *Pacific Gas & Electric Co.* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 [270 Cal.Rptr. 1, 791 P.2d 587].)

■ In either case, "As Justice Tobriner said in the context of voidable contracts: 'The actionable wrong lies in the inducement to break the contract or to sever the relationship, not in the kind of contract or relationship so disrupted, whether it is written or oral, enforceable or not enforceable.' [Citations.]" (*Pacific Gas & Electric Co.* v. *Bear Stearns & Co., supra,* 50 Cal.3d at p. 1127.) However, it must be remembered that these torts are *intentional* torts.

In discussing the related tort of inducing breach of contract, the Supreme Court has stated: "The act of inducing the breach must be an intentional one. If the actor had no knowledge of the existence of the contract or his actions were not intended to induce a breach, he cannot be held liable though an actual breach results from his lawful and proper acts. [Citations.]" *Imperial Ice Co.* v. *Rossier* (1941) 18 Cal.2d 33, 37 [112 P.2d 631].) The Restatement of Torts explained it this way, "The essential thing is the *purpose to cause the result.* If the actor does not have this purpose, his conduct does not subject him to liability under this rule *even if it has the unintended effect of deterring the third person from dealing with the other.*" (Rest., Torts, § 766, com. d, italics added.) It is not enough that the actor intended to perform the acts which caused the result—he or she *must have intended to cause the result itself.* Although these views were expressed in the context of the tort of inducing breach of contract, the expansion of that tort into the broader wrongs of interfering with contractual relations or prospective economic

Cal.3d 752, 765 [206 Cal.Rptr. 354, 686 P.2d 1158], disapproved on another point in *Freeman & Mills, Inc.* v. *Belcher Oil Co.* (1995) 11 Cal.4th 85, 103 [44 Cal.Rptr.2d 420, 900 P.2d 669].)

advantage has not altered the requirement that the defendant act with culpable intent. (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d at p. 766.) "[T]o prevail on a cause of action for intentional interference with prospective economic advantage, plaintiff must plead and prove '*intentional* acts on the part of the defendant *designed* to disrupt the relationship.' [Citations.]" (*Ibid.,* quoting from *Buckaloo* v. *Johnson, supra,* 14 Cal.3d at p. 827.)

### 3. *A Party to an Economic Relationship Cannot, as a Matter of Law, Commit or Conspire to Commit a Tortious Interference Therewith*

■ There is an important limitation to the use of this tort as a remedy for the disruption of contractual relationships. *It can only be asserted against a stranger to the relationship.* "[C]onsistent with its underlying policy of protecting the expectations of contracting parties against frustration *by outsiders* who have no legitimate social or economic interest in the contractual relationship, the tort cause of action for interference with a contract does not lie against a party to the contract. [Citations.]" (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514 [28 Cal.Rptr.2d 475, 869 P.2d 454].) "It is obvious that if an action is brought for interference with contractual relationship by one party to a contract against another who is also a party to that same contract, the grievance of the plaintiff is, in essence, breach of contract; and, in such case, plaintiff is entitled to recover all damages flowing from the breach. *In such an instance to allow the plaintiff to sue under the tort theory of wrongful interference with contractual rights would not only be superfluous, but also would enable him to recover tort damages (e.g., punitive damages, damages for mental suffering)* to which he is not entitled under California law." (*Dryden* v. *Tri-Valley Growers* (1977) 65 Cal.App.3d 990, 999 [135 Cal.Rptr. 720], italics added; see also *Shoemaker* v. *Myers* (1990) 52 Cal.3d 1, 24 [276 Cal.Rptr. 303, 801 P.2d 1054].)

As already suggested, and as we discuss in more detail below, the same rationale should also bar prosecution of the tort of interference with prospective economic advantage against a party to the relationship from which the plaintiff's anticipated economic advantage would arise. Thus, the WJM defendants could not be properly charged with liability under that tort theory. However, the jury found that they had only *conspired* with Antonovich to commit the tort. Does that make a difference?

Over 30 years ago, an appellate court did hold that one contracting party, by use of a conspiracy theory, could impose liability on another for the tort

of interference with that contract. (*Wise* v. *Southern Pacific Co.* (1963) 223 Cal.App.2d 50, 71-72 [35 Cal.Rptr. 652].) This decision was accepted and followed in a number of appellate cases. However, it was never accepted by the Supreme Court.

Now, in *Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.*, *supra*, 7 Cal.4th 503, the Supreme Court has firmly rejected the *Wise* rule. It cited two reasons for doing so: "(1) it illogically expands the doctrine of civil conspiracy by imposing tort liability for an alleged wrong—interference with a contract—that the purported tortfeasor is legally incapable of committing; and (2) it obliterates vital and established distinctions between contract and tort theories of liability by effectively allowing the recovery of tort damages for an ordinary breach of contract." (*Id.*, at p. 510.) ■ The *Applied Equipment* court went on to state, " ' "The elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design. . . . In such an action the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity." ' (*Doctors' Co.* [v. *Superior Court* (1989)] 49 Cal.3d [39,] 44 [260 Cal.Rptr. 183, 775 P.2d 508], citing *Mox Incorporated* v. *Woods* (1927) 202 Cal. 675, 677-678 [262 P. 302].)" (*Id.* at p. 511.)

■ "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. [Citation.] By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. . . . In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors. [¶] Standing alone, a conspiracy does no harm and engenders no tort liability. It must be activated by the commission of an actual tort. ' "A civil conspiracy, however atrocious, does not per se give rise to a cause of action unless a civil wrong has been committed resulting in damage." ' [Citations.] 'A bare agreement among two or more persons to harm a third person cannot injure the latter unless and until acts are actually performed pursuant to the agreement. Therefore, it is the acts done and not the conspiracy to do them which should be regarded as the essence of the civil action.' [Citation.] [¶] . . . [¶] By its nature, tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort, i.e., that he or she owes a duty

to plaintiff recognized by law and is potentially subject to liability for breach of that duty." (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.*, *supra*, 7 Cal.4th at pp. 510-511.)

██ If the WJM defendants are not legally capable of committing the tort on which plaintiff's entire judgment rests, then nothing is added by attempting to metamorphasize their conduct through reliance on a claim of conspiracy. Plaintiff's conspiracy theory is fundamentally irreconcilable with both the law of conspiracy and the tort of interference with prospective economic advantage. ██ The Supreme Court stated in *Applied Equipment* (in the context of the related tort of interference with contract), "One contracting party owes no general tort duty to another not to interfere with performance of the contract; its duty is simply to perform the contract according to its terms. The tort duty not to interfere with the contract falls only on strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance. [¶] The invocation of conspiracy does not alter this fundamental allocation of duty. Conspiracy is not an independent tort; it cannot create a duty or abrogate an immunity. It allows tort recovery only against a party who already owes the duty and is not immune from liability based on applicable substantive tort law principles. [Citations.] Because a party to a contract owes no tort duty to refrain from interference with its performance, he or she cannot be bootstrapped into tort liability by the pejorative plea of conspiracy." (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.*, *supra*, 7 Cal.4th at p. 514.)

Plaintiff seeks to distinguish *Applied Equipment*, which was not handed down until *after* the trial in this case, by pointing out that it involved an interference with *contractual* relations. He argues that its ruling must be limited to cases where there was an existing contract between the plaintiff and the third party and that it cannot be applied where the defendant's interference is only with prospective economic advantage. We reject this contention.[23]

As we have already pointed out, the tort of interference with contractual relations is but a species of the broader tort of interference with prospective

---

[23]One of the puzzling things about this argument is that it is totally undermined by plaintiff's claim (see fn. 5, *ante*) that an "agreement" for a $2.5 million buy-out of interest was reached at the second settlement conference on October 19, 1988. That claim was apparently advanced by plaintiff to show that there was a dispute (to be resolved by the jury) as to whether the buy-out negotiations had actually failed before the WJM defendants had even met with Antonovich. The WJM defendants have consistently claimed (and they so testified) that such negotiations had been abandoned long before their meeting with Antonovich or any attempt to contact Judge Younger was made.

economic advantage. The Supreme Court in *Buckaloo* v. *Johnson, supra,* quoted with approval the characterization of these two torts as involving the same basic conduct on the part of the defendant and that the only real impact of the absence of an existing contractual relationship was that the tort would be infused with broader grounds for justification of the interference. (*Buckaloo* v. *Johnson, supra,* 14 Cal.3d at p. 823, fn. 6.) Indeed, on two separate and distinct occasions our Supreme Court has suggested that it may well be preferable not to distinguish an interference with contractual relations and an interference with prospective economic advantage as separate torts. (*Buckaloo* v. *Johnson, supra,* 14 Cal.3d at p. 823, fn. 6; *Pacific Gas & Electric Co.* v. *Bear Stearns & Co., supra,* 50 Cal.3d at p. 1128, fn. 4.) It would seem that these two torts are not so fundamentally different that the principles approved in *Applied Equipment* cannot be applied to both. (See also *Kruse* v. *Bank of America, supra,* 202 Cal.App.3d at p. 66.)

More directly, the *Applied Equipment* decision itself makes clear that the Supreme Court gives no recognition to the distinction urged by plaintiff. The court specifically disapproved of nine Court of Appeal decisions which were contrary to its holding. (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd., supra,* 7 Cal.4th at p. 510.) One of those cases, *Olivet* v. *Frischling* (1980) 104 Cal.App.3d 831 [164 Cal.Rptr. 87], specifically addresses a conspiracy claim for intentional interference with prospective economic advantage. The *Olivet* court concluded that, even though the defendants were engaged in the ongoing business relationship with plaintiff, and defendants could not be liable for interference "with [their] own economic relations," they could nonetheless be liable for "an independent action for civil conspiracy." (*Id.* at p. 838.) Thus, by expressly disapproving *Olivet,* the *Applied Equipment* court made clear that it was applying its holding to both species of the interference torts.

Finally, as a simple matter of logic, plaintiff's argument makes no sense whatever. In *Applied Equipment,* the court dealt with an interference with a *contractual* relationship and held that a party to the contract who could not, as a matter of law, be liable in tort for interfering with the performance of the contract, also could not be held tortiously liable for *conspiring* to interfere with it. One of the rationales for the court's decision was that defendant owed no duty *in tort* not to breach the contract or interfere with its performance; plaintiff had a contract damage remedy against the breaching party and should not be permitted to add a claim in tort for conduct that really amounted to nothing more than a breach of contract. (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd., supra,* 7 Cal.4th at pp. 517-518.)

 The logic of this reasoning should, in our view, have a fortiori application where there is no contractual but only a *prospective* relationship. If a party has no liability in tort for refusing to perform an existing contract, no matter what the reason, he or she certainly should not have to bear a burden in tort for refusing to *enter into* a contract where he or she has no obligation to do so. If that same party cannot conspire with a third party to breach or interfere with his or her own contract then certainly the result should be no different where the "conspiracy" is to disrupt a relationship which has not even risen to the dignity of an existing contract and the party to that relationship was entirely free to "disrupt" it on his or her own without legal restraint or penalty. In short, nothing said by the court in *Applied Equipment* requires or even suggests that the "injured" plaintiff should be given a tort remedy to "replace" the contract remedy he would not have been entitled to in any event.

 That such a result might deprive plaintiff of any remedy against the WJM defendants is simply reflective of the simple and obvious legal reality that the WJM defendants had no obligation to buy out plaintiff's interest in Plaza II and were at all times free to refuse to do so for any reason, however malevolent. To hold otherwise would give the plaintiff greater rights against the WJM defendants than he would have had if a contract had actually existed. Whatever may be the exposure of the nonparty interferer, the principles announced in *Applied Equipment* clearly should apply to bar a tort claim against a party to a prospective relationship, including one based on conspiracy.

We therefore conclude that the WJM defendants cannot be liable to plaintiff for conspiracy to interfere with any prospective economic advantage which plaintiff might have expected from the hoped for buy-out of his interest in Plaza II. As the *Applied Equipment* court put it, ". . . tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort, i.e., that he or she owes a duty to plaintiff recognized by law and is potentially subject to liability for breach of that duty." (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.*, *supra*, 7 Cal.4th at p. 511.) The WJM defendants clearly owed plaintiff no legal duty whatever with respect to the proposed buy-out of his partnership interest in Plaza II. The judgment against the WJM defendants must therefore be reversed. However, the question remains can the County defendants nonetheless be held liable?

#### 4. *The Evidence Was Not Sufficient to Prove That the County Defendants Intentionally Interfered With Plaintiff's Prospective Economic Advantage*

##### a. *The Relevant "Economic Relationship" Was the Buy-out Negotiations*

Based upon the jury's verdict, (see fn. 17, *ante*), judgment against the defendants rests upon the determination that Antonovich's telephone call to Judge Younger on November 21, 1988, constituted a tortious intentional interference with plaintiff's prospective economic advantage and that this was done pursuant to a conspiracy between Antonovich and the WJM defendants. The prospective economic advantage which was allegedly lost to plaintiff was the buy-out of his interest in Plaza II by the Joint Venture.[24] In 1988, he had been offered at least $2 million, but had demanded $3 million; and in 1991, when he finally agreed to a purchase of his interest, he had to accept $800,000. This was plaintiff's theory at trial; it was and is his position that the WJM defendants, believing that they had "put in the fix" with the judge, refused to negotiate and conclude the buy-out for the $2 million to $3 million which had been discussed. Plaintiff specifically described, in the allegations of the second amended complaint, the "prospective economic advantages" of which he had allegedly been deprived: (1) the continued economic benefit of Plaza II; (2) termination of the litigation; (3) speedy collection of the construction judgment; and (4) any prospective sale of plaintiff's interest in Plaza II.[25]

Thus, the "relationship" with which the County defendants necessarily had to interfere in order to give plaintiff any actionable claim, was the settlement

[24]There can be no real disagreement that the prospective economic advantage which plaintiff claims he lost was the money he would have received for the buy-out of his partnership interest. That is precisely what was alleged in the charging allegations of plaintiff's second amended complaint. It was also plaintiff's theory at trial and it was obviously the basis for his compensatory damage claim. As his attorney put it in opening statement to the jury:

"We contend if it had not been for the interference with this probable prospective economic advantage that Mr. Kasparian had, the dissolution of the Plaza II Partnership, he would have received that money at that period of time had it not been for contact by Mr. Antonovich with Judge Younger [¶] Now understand, ladies and gentlemen of the jury, the dissolution of the Plaza II Partnership was not part of the underlying lawsuit. It was an agreement that they had made because they had both realized that they could not live together as business partners. Mr. Kasparian received ultimately significantly less than he would have, and we contend it is as a result of this conduct by Mr. Antonovich with Judge Younger."

[25]The record reflects beyond dispute that the first and third of these factors in fact represented no loss to plaintiff at all. Because there was no buy-out of his interest in Plaza II until May of 1991, plaintiff continued until that time to receive the full economic benefit of his partnership interest. With respect to the alleged delay in the satisfaction of the construction judgment, the trial court granted a nonsuit. It held that plaintiff suffered no loss by reason

and buy-out negotiations which had commenced in October 1988 and involved competing offers between $2 million and $3 million.

b. *There Was No Substantial Evidence That Antonovich Had Any Knowledge of the Buy-out Negotiations*

Contrary to the apparent finding of the jury, there is no evidence whatever that Antonovich had any knowledge of the buy-out negotiations. Such knowledge is critical to any claim that Antonovich conspired or intended to interfere with any prospective economic advantage anticipated by plaintiff.[26] There are only two bases in the record upon which plaintiff could rely to show such critical knowledge. The first is an improper imputation and the second is an improper inference. Because the defendants Sukyas and Suri had knowledge of the buy-out negotiations, the trial court imputed such knowledge to Antonovich. However, even assuming it was otherwise proper for the court to do this, the court's ruling depends on Sukyas and Suri being "co-conspirators" with Antonovich. As we have already discussed, the WJM defendants could not be coconspirators. Thus, the court's reliance upon such status to impute knowledge to Antonovich was without legal foundation.

When Antonovich was asked at trial if he had been told (at the Nov. 17, 1988, luncheon) that a lawsuit was then pending between plaintiff and the WJM defendants he answered in part (see fn. 9, *ante*): "It was in the conversation indicated that there was—a decision was being made on this, *an agreement* or disagreement with one of their partners." (Italics added.) At no point was Antonovich ever asked about, nor did he ever mention, the buy-out negotiations. Plaintiff simply argues that the jury could *infer* from Antonovich's use of the word "agreement" that he did know of them. However, there is no way to determine what was meant by Antonovich in his

---

of such delay for which he was not fully compensated by way of interest, costs and fees which were included in and paid as a part of that judgment.

[26]At the pleading stage of this case, plaintiff also thought that he had to show such knowledge on Antonovich's part in order to recover from the County defendants. In his second amended complaint he alleged that: (1) the WJM defendants knew that plaintiff was using substantial funds to litigate the partnership case and that its termination would be to his significant economic benefits; (2) the WJM defendants wanted to keep the pressure on him by prolonging the litigation so they could force him to sell his interest in Plaza II for less than its actual valve; (3) *Antonovich knew of this prospective advantage to plaintiff "and that settlement negotiations had progressed to the point where a settlement of the trial was eminent [sic]"* and (4) in order to secure future political contributions and to repay those received in the past from the WJM defendants, Antonovich and those defendants "decided to enter into an illegal conspiracy for the unlawful purpose of improperly influencing a Superior Court Judge in the *performance of his duties in fairly adjudicating the dispute [between] plaintiffs and the [WJM defendants]."*

use of the words "agreement or disagreement." Defendants argue it was simply a slip of the tongue immediately corrected. Plaintiff, on the other hand, argues that use of the word "agreement" permits an inference by the jury that Antonovich had been told of the buy-out negotiations. However, that is pure speculation. ▉ Inferences must be " 'a product of logic and reason' and 'must rest on the evidence' . . . ." (*Kuhn* v. *Department of General Services, supra,* 22 Cal.App.4th at p. 1633.) ▉ As plaintiff's counsel asked no questions about Antonovich's awareness of the buy-out negotiations, nor was there any such testimony from any other witness, the jury had no context or evidence in which to make any inference at all. Therefore, such an inference by the jury would be entirely unsupported.

As the record provides no other evidence of such knowledge on the part of Antonovich, we conclude that the jury's answer of "Yes" to question No. 2 (phase I) in the special verdict form[27] was without evidentiary support. The only "economic relationship" which was relevant was represented by the buy-out negotiations.[28] That was what plaintiff alleged and argued had been disrupted by Antonovich's actions. Mere knowledge of the partnership relationship was meaningless; moreover, there is no claim that Antonovich did anything to disrupt or interfere with that. Since there is no evidence of Antonovich's knowledge of the buy-out negotiations, a conclusion with which the trial judge agreed,[29] the jury's finding is without evidentiary support.

---

[27]See footnote 17, *ante.*

[28]Nonetheless, plaintiff persuaded the trial judge that it was enough for Antonovich to simply have knowledge of the *existence* of the partnership and the fact that there was a dispute among the partners. As the trial judge stated in rejecting defendants' objections to the proposed special verdict form and its failure to require the jury to find that Antonovich had knowledge of the buy-out negotiations and the intent to disrupt them: "[Plaintiff's counsel] has convinced me that the economic relationship is the partnership itself and the prospective economic advantage is the buy-out, and that is the basis for the court's ruling."

[29]In denying the motions of the defendants for a judgment notwithstanding the verdict and a new trial, the court stated: "As to the liability of defendants Antonovich and County of Los Angeles, the Court differs somewhat with plaintiff's position that all that need be proved regarding Antonovich's knowledge was that a business relationship existed between Kasparian, Sukyas, Suri, and Western Jewelry Mart. The Court believes he also had to know about the pending lawsuit. But since knowledge of the pending lawsuit was undisputed, it seems unnecessary to belabor the point. [¶] *What is somewhat more troubling is a dearth of evidence regarding Antonovich's knowledge of any buyout negotiations.* While this is a difficult issue, it remains the Court's understanding of the law that when some conspirators know the full nature of the relationship and others only part, those with lesser information cannot escape liability for the tort so long as they understand the tortious gravamen of their conduct. The Court does not believe defendant Antonovich can escape liability on the theory that while Sukyas and Suri knew about the buyout negotiations, he knew only that there was a trial to be influenced or disrupted." (Italics added.)

### c. *There Was No Substantial Evidence That Antonovich Intended to Disrupt the Buy-out Negotiations*

The evidence in this case reflected that after a meeting with the WJM defendants, who were his political and financial supporters, and at their request, Antonovich placed a telephone call to Judge Younger, the trial judge assigned to try the lawsuit then pending between the WJM defendants and the plaintiff. The defendants claimed that the telephone call was placed for the purpose for providing a "character reference" for at least one of the WJM defendants. However, the jury could reasonably have inferred that the purpose of the call was to improperly influence Judge Younger in favor of the WJM defendants and thus unfairly tilt the judicial process to their advantage. Thus, the evidence would justify the conclusion that such interference was also the intent of Antonovich.

However, we do not see how this record can be stretched beyond that point. Again, because there is *no evidence* that Antonovich had knowledge of the buy-out negotiations, we cannot find any evidentiary support for the conclusion that he intended to disrupt *them*. Quite apart from the fact that the clear weight of the evidence shows that the buy-out negotiations had already failed by the time Antonovich made his call to Judge Younger, the outcome of the buy-out negotiations was clearly not up to the judge. His function was to preside over the legal proceedings which would *only* go forward in the event the negotiations had failed. Whether they failed or not depended on no one else but the plaintiff and the WJM defendants themselves. Absent evidence that Antonovich had knowledge of the negotiations, we can see no logical way to conclude that Antonovich's intent could be anything other than to influence or interfere with the outcome of the trial.

Moreover, there is a certain illogic in the proposition that Antonovich would be induced by the WJM defendants to interfere with negotiations which they were legally free to abandon at any time. There would simply be no point in bringing Antonovich and his influence to bear on an issue over which the WJM defendants themselves had total control. Based on the record before us, there is *no evidence that Antonovich had any intent or purpose* in this matter other than that desired by his political supporters who induced him to act; that is, to influence Judge Younger in favor of the WJM defendants.

The Supreme Court has stated, in discussing the related tort of interference with contract, " 'The essential thing is the *purpose to cause the result*. If the actor does not have this purpose, his conduct does not subject him to

liability . . . *even if it has the unintended effect of deterring the third person from dealing with the other.'* . . . It is not enough that the actor intended to perform the acts which caused the result—he or she must have intended to cause the result itself." (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.*, *supra*, 36 Cal.3d at p. 765, quoting from Rest., Torts., § 766, com. d, italics added by the Supreme Court.) It is clear that the "result" for which plaintiff sought to recover was the disruption of his negotiations with the WJM defendants for a buy-out of his interest in Plaza II. Thus, it was incumbent upon him to prove that Antonovich had the intent to achieve, by his actions, that particular result. This plaintiff failed to do.

 d. *There Was No Substantial Evidence to Show That but for Antonovich's Telephone Call to Judge Younger There Was a Reasonable Probability That the Buy-out Negotiations Would Have Concluded to Plaintiff's Economic Advantage*

As a matter of law, there is a threshold causation requirement in order to establish the tort of intentional interference with prospective economic advantage. What is required is "proof that it is *reasonably probable* that the lost economic advantage would have been realized *but for* the defendant's interference." (*Youst* v. *Longo* (1987) 43 Cal.3d 64, 71 [233 Cal.Rptr. 294, 729 P.2d 728, 85 A.L.R.4th 1025], italics added, except for the word "probable.") "Over the past several decades, California courts analyzing the tort of interference with prospective economic advantage have required such a threshold determination. In *Buckaloo* v. *Johnson* . . . , where we set out the five elements of the *intentional* form of the tort, we stated that the first element requires 'the *probability* of future economic benefit.' [Citation.] Although varying language has been used to express this threshold requirement, the cases generally agree it must be reasonably probable that the prospective economic advantage would have been realized but for defendant's interference. [Citations.]" (*Id.*, at p. 71, fn. omitted.)

The uncontroverted evidence before us shows that Antonovich did not induce the WJM defendants not to enter into an agreement to buy out plaintiff's partnership interest in Plaza II. As already pointed out, the WJM defendants were entirely free to make their own decision regarding the negotiations with plaintiff which they themselves had initiated and which they had no obligation to continue or conclude. There is no evidence that Antonovich had any interest one way or the other in what choice they made. At most, the evidence establishes that the WJM defendants induced Antonovich to intercede with Judge Younger on their behalf, which intercession ultimately resulted in a two-and-one-half-month delay in the starting date for

the trial of the partnership case. We simply see no evidentiary support for the jury's finding that Antonovich's telephone call was the "but for" cause of the failure of the buy-out negotiations.

CONCLUSION

In sum, we conclude that there is no legal basis for finding the WJM defendants liable for conspiring to interfere with the very economic relationship to which they were a party. They had every right to walk away from the negotiations to buy out plaintiff's interest in Plaza II and plaintiff cannot hold them liable for doing so by charging them with a conspiracy to commit a tort for which they legally cannot be held liable. The County defendants, on the other hand, are strangers to the economic relationship between plaintiff and the WJM defendants and could be liable for an interference tort, but the evidence is simply not sufficient to demonstrate two of the essential elements of the tort on which plaintiff relies. Therefore, there is no legal or factual basis for the judgment entered in plaintiff's favor and it must be reversed. This will render moot plaintiff's cross-appeal with respect to an award of prejudgment interest on that judgment.

Regrettably, we cannot conclude this opinion without addressing one additional matter. Our decision to reverse the judgment should not be construed as an exoneration of the County defendants for their conduct in this case. That reversal is required because, under the particular facts of this case, plaintiff is not legally entitled to recover on the tort claim which he chose to pursue. However, the evidence presented was more than sufficient to permit the jury to conclude that Antonovich had allowed his political supporters to induce him to attempt to influence a superior court judge in a pending case. This is unacceptable behavior. That it was done in the context of the contemporaneous receipt of substantial political contributions from the individuals in whose favor the influence was sought makes it all the more reprehensible.

We are not prepared to accept the proposition that this sort of thing can be justified as normal constituent service. The strength of our entire judicial system rests upon the confidence and trust which the public has in the fairness and impartiality of the decisions which are made. If the public ever begins to doubt that the judicial process is free of special influence or political manipulation, then there can be no justice. Judicial decisions must not only be fair and just in fact, they must be so perceived. We therefore cannot condemn too strongly the attempt made in this case by an important

elected public official to influence an anticipated judicial decision.[30] If we ever begin to permit such behavior to go unchallenged we place at risk the single most critical foundation of any viable democracy: an *independent* judiciary.

## DISPOSITION

The judgment in favor of plaintiff on his second amended complaint is reversed and the matter is remanded with directions to enter judgment in favor of the defendants. Plaintiff's cross-appeal is dismissed as moot. Each party shall bear its own costs on appeal.

Klein, P. J., and Aldrich, J., concurred.

A petition for a rehearing was denied October 16, 1995, and the petition of appellant Avedis Kasparian for review by the Supreme Court was denied November 29, 1995.

---

[30]We also note with considerable dismay that the county, *with full knowledge of the facts,* willingly and publicly asserted that Antonovich was acting within the course and scope of his supervisorial duties when he acted to interfere with a pending judicial proceeding. (See fn. 16, *ante.*) Finally, the conduct of Judge Younger is likewise subject to criticism. Without doubt, he should not have permitted the telephone conversation with Antonovich to continue after he learned that it related to a case then pending before him; and he should have immediately advised counsel of the conversation and its contents. The fact that he eventually recused himself from the case indicates a recognition that his participation in that conversation at the very least created the appearance of impropriety.