Filed 3/6/18

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| In re CHRISTOPHER LEE WHITE on Habeas Corpus. | D073054 (San Diego County Super. Ct. No. SCN376029) |
|---|---|

ORIGINAL PROCEEDING in habeas corpus. Robert J. Kearney, Judge. Petition denied.

Boyce & Schaeffer, Laura Schaefer, Robert E. Boyce and Benjamin Kington for Petitioner.

Summer Stephan, District Attorney, Jesus Rodriguez, Assistant District Attorney, Peter Quon, Jr., Mark A. Amador, Linh Lam and Daniel Owens, Deputy District Attorneys for San Diego County District Attorney.

Petitioner Christopher Lee White is in custody awaiting trial on charges of attempted kidnapping with intent to commit rape (Pen. Code, § 209, subd. (b)),[1] assault with intent to commit rape (§ 220, subd. (a)(1)), contact with a minor with intent to

---

[1] Further statutory references are to the Penal Code unless otherwise specified.

commit a sexual offense (§ 288.3, subd. (a)), and false imprisonment (§§ 236, 237, subd. (a)). At his preliminary hearing, White requested release on reasonable bail.

The California Constitution provides that a defendant "shall be released on bail by sufficient sureties" unless an exception applies. (Cal. Const., art. I, § 12.) One such exception covers "[f]elony offenses involving acts of violence on another person, or felony sexual assault offenses on another person, when the facts are evident or the presumption great and the court finds based on clear and convincing evidence that there is a substantial likelihood the person's release would result in great bodily harm to others." (*Id.*, art. I, § 12, subd. (b).) The trial court here recognized that it is "unusual" to deny bail for a noncapital offense, but it nonetheless found that the exception applied.

White challenges the court's finding by petition for writ of habeas corpus. (§ 1490.) He asserts that the court erred by finding that the constitutional exception applied. For reasons we will explain, we disagree and deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

Fifteen-year-old J.D. lived with her family near the beach in Encinitas, California. On July 26, 2017, she was staying with friends because her family had been on vacation. In the afternoon, she rode her bicycle to her family's house to get her surfboard and go surfing. Across from her house she saw two men standing near a blue truck. They were playing loud music and looked out of place. J.D. felt like they were watching her.

A woman loading her car nearby saw the two men and thought they looked "creepy." The men were staring at her as well. She was concerned that they might burglarize her vacation rental after she left. The woman's son thought they were being

2

"creepy" also, so he took a Snapchat video of them. He told police he was worried about the men wanting to kidnap his younger brothers.

J.D. had a bad feeling about the men, so she went through a gate into her neighbor's yard, hopped over the fence, and went into her garage. She later said she was trying to prevent the men from seeing where she lived. J.D. retrieved her surfboard from the garage, went out front, and left the surfboard in her driveway. The men were still staring at her, which made her feel uncomfortable.

J.D. went inside, but she became concerned that someone would try to steal her surfboard. She grabbed some surfboard wax, went back outside, and started to wax the surfboard. The men were still standing by their truck. J.D. noticed a few people walk by, and a surfer came up from the beach and asked to borrow some wax. This request was normal, so J.D. agreed.

J.D. continued to wax her surfboard in the driveway. At some point, when she had her back to the road, one of the men from the truck came up behind her and grabbed her neck "like a pressure lock." The man—later identified as White's roommate Jeremiah Owens—shoved J.D.'s face toward the driveway, but J.D. managed to catch herself with her hands. Owens said, "All right. Let's do this." He tried to pull her upright and toward the truck. J.D. repeatedly told him "no" and "stop."

J.D. managed to fight Owens off and step away from him. She saw the other man—later identified as White—still standing by the truck, looking up and down the street. She told Owens and White, "That's not cool. You can't do that." White said, "We're sorry" or "Sorry," and J.D. backed away toward her house. But then, while J.D.

3

was watching them, White looked at Owens and said, "Go in the house." J.D. thought Owens would try and attack her again.

J.D. went through the gate, locked it "as fast as [she] could," and ran into the house. Her neighbor's dog was barking near the gate. J.D. was "really scared" and locked both doors into the house. She thought Owens and White were going to follow her inside. She thought they might break the lock on the gate or hop over the fence. She was going to hide, but she heard the truck's engine start. She looked outside and saw White in the driver's seat. Owens ran around to the passenger side. J.D. thought they looked scared, and they drove quickly away. She started hyperventilating and crying. She tried and eventually succeeded in calling her parents, who told her to call the police. She called 911, and police responded.

The police began an investigation and detained White. In two interviews with police, White denied knowing that Owens intended to attack J.D. White said Owens told him he thought J.D. was pretty. White admitted he "might have said go and get her" to Owens, but he said he meant go "talk to her." Owens then told him "hey watch out" or "watch this" and walked over to J.D. White said he thought Owens was just going to talk to her. White claimed that, when the attack began, he yelled at Owens to stop and told J.D. he was sorry. White said Owens told him afterwards that a "primal instinct" came over him. White was concerned that Owens had mental health issues. Forensic examination of White's mobile phone revealed an internet search history in the days after the attack that included the questions, "Why would someone act on their primal

4

instinct?," "How can you tell if someone you know is being brain washed?," and "What to do if someone you know is being brainwashed?" Owens was later arrested as well.

The San Diego County District Attorney charged White and Owens with the offenses identified above. White was arraigned, pleaded not guilty, and was detained without bail. In advance of his preliminary hearing, White filed a written request for bail. It alleged that he had no criminal history and was not a violent person. It was supported by a number of letters from family and friends.

At the preliminary hearing, the court heard testimony from J.D. and several investigating officers. After the testimony, the prosecution asked the court to find probable cause and bind White and Owens over for trial. The prosecution believed that Owens was the direct perpetrator and White was an aider and abettor of the attack on J.D. The court agreed. It found J.D. to be a credible witness. As to White, it found persuasive the following facts and inferences from J.D.'s testimony: (1) White and Owens loitered in front of J.D.'s house without any legitimate purpose, (2) they stared at J.D. in an abnormal manner, (3) White told Owens he should go into the house with J.D., (4) White waited for Owens to come back from attacking J.D. and drove away with him, and (5) White behaved like a lookout during the attack.

The court then heard White's request for bail. White's counsel argued that White was a high school graduate, was gainfully employed as a cable installer, and had the support of family and friends. He requested that bail be set at $50,000. Owens requested bail as well. The prosecution opposed. As to White, it argued, "I will submit to the Court that Mr. White did, in fact, aid and abet, encouraged this very violent crime. And I

5

believe the Court is on sound legal ground to deny bail to him. I'll submit to the Court as to whether you would like to set bail, given the fact that he is not as culpable perhaps as Mr. Owens in being the direct perpetrator."

The court recognized, "It would be an unusual case, in fact, it would be the quite rare case where someone was held on a non-capital offense without bail." But the court believed the circumstances justified remand without bail here. It explained, "In looking at this case and the facts of the case, I do believe the facts are evident, [and] the presumption is great. I do find by clear and convincing evidence that one defendant inflicted the acts of violence, the other person aided and abetted in that. The Court finds on the basis of the clear and convincing evidence that there is a substantial likelihood that the release of either of these gentlemen would result in great bodily harm to others. I think the individuals [*sic*] at threat would be J.D. herself. I also think other children, who are the most vulnerable members of our society, would be at risk based on the conduct in this case and what's alleged to have occur[red] in this case. So it is extremely unusual, but I do find under these particular facts that the burden is met."

White challenged the court's remand order by petition for writ of habeas corpus in this court. He requested that we direct the trial court to vacate the order and set reasonable bail. We requested and received an informal response from the district attorney. After considering the petition and the informal response, we issued an order to show cause why the relief sought by White should not be granted. This proceeding followed.

6

DISCUSSION

I

As noted, the California Constitution provides that a defendant "shall be released on bail by sufficient sureties" unless an exception applies. (Cal. Const., art. I, § 12.) The Constitution initially contained a single exception, for "capital offenses when the proof is evident or the presumption great." (Former Cal. Const., art. I, § 6; *In re Application of Weinberg* (1918) 177 Cal. 781, 782; *Ex parte Curtis* (1891) 92 Cal. 188, 189; *In re Nordin* (1983) 143 Cal.App.3d 538, 543 (*Nordin*).) The electorate later adopted an initiative constitutional amendment that added two additional exceptions. (Cal. Const., art. I, § 12, amended by initiative, Primary Elec. (June 8, 1982); see *In re Bright* (1993) 13 Cal.App.4th 1664, 1667, fn. 4; *Nordin*, at p. 543.)

One of the added exceptions, which is at issue here, covers "[f]elony offenses involving acts of violence on another person, or felony sexual assault offenses on another person, when the facts are evident or the presumption great and the court finds based on clear and convincing evidence that there is a substantial likelihood the person's release would result in great bodily harm to others[.]" (Cal. Const., art. I, § 12, subd. (b).)[2] White challenges the trial court's findings that (1) "the facts are evident or the

_____

[2] The phrase "felony sexual assault offenses on another person" was not part of the original exception. It was added later. (See Assem. Const. Amend. No. 37, Stats. 1994 (1993-1994 Reg. Session) res. ch. 95, approved Nov. 8, 1994.) The other added exception covers "[f]elony offenses when the facts are evident or the presumption great and the court finds based on clear and convincing evidence that the person has threatened another with great bodily harm and that there is a substantial likelihood that the person would carry out the threat if released." (Cal. Const., art. I, § 12, subd. (c).)

7

presumption great" and (2) "there is a substantial likelihood the person's release would result in great bodily harm to others."

## II

Although its phrasing is archaic, the requirement that "the facts are evident or the presumption great" has long been held to mean simply that the evidence in the record would be sufficient to sustain a conviction. (*Nordin, supra*, 143 Cal.App.3d at p. 543; see *In re Application of Weinberg, supra*, 177 Cal. at p. 782; *Ex parte Curtis, supra*, 92 Cal. at p. 189.) Our consideration of this requirement is therefore governed by the familiar substantial evidence standard: "When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] Our review must presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] Even where, as here, the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might reasonably be reconciled with the defendant's innocence. [Citations.] It is the duty of the jury to acquit the defendant if it finds the circumstantial evidence is susceptible to two interpretations, one of which suggests guilt and the other innocence. [Citation.] But the relevant inquiry on appeal is whether, in light of all the

8

evidence, '*any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.' " (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44 (*Zaragoza*).)[3]

White is alleged to have aided and abetted Owens in the commission of the charged offenses. " 'A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' " (*People v. Hill* (1998) 17 Cal.4th 800, 851.) J.D. testified that White and Owens watched her for an unusual length of time, making her feel uncomfortable; that White appeared to act as a lookout for Owens; that White did not intervene during the attack but instead encouraged Owens to take J.D. into her house; and that White waited for Owens after the attack and drove him away. While White's statements to police denied any malicious intent, he acknowledged discussing J.D.'s attractiveness and telling Owens to "go and get her." Based on this record, a reasonable jury could find beyond a reasonable doubt that White and Owens agreed that Owens would attack J.D. while White acted as his lookout. The jury could find credible J.D.'s interpretation of White's behavior and of his statement

---

3    The phrase "the facts are evident or the presumption great" has the same meaning for the trial court, so its assessment of this requirement is governed by the same substantial evidence standard. Because sufficiency of the evidence is a legal question, we do not defer the trial court's determination. We review the record independently to determine whether the evidence would be sufficient to sustain a conviction. This situation is analogous in substance to a trial court's consideration of a motion for acquittal under section 1118.1 and our review thereof. (See *People v. Houston* (2012) 54 Cal.4th 1186, 1215; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 200.)

9

("Get in the house") and convict him of the charged offenses on that basis. White has not shown that the evidence in the record would be insufficient to sustain his conviction.

White points out that mere presence at the scene of a crime, or failure to intervene, is insufficient in and of itself to constitute aiding and abetting. (See *People v. Pettie* (2017) 16 Cal.App.5th 23, 57; *In re Michael T.* (1978) 84 Cal.App.3d 907, 911.) But J.D.'s testimony shows that White's participation was much greater than simply presence at the scene or failure to intervene. A jury could reasonably infer that White acted as a lookout during the attack and encouraged Owens to continue after J.D. first fought him off.

While a reasonable jury could alternatively find that Owens acted independently, as White claims, the constitutional standard requires us to consider whether the evidence would be sufficient to sustain a conviction, presuming the existence of every fact a jury could reasonably deduce from the evidence and resolving any conflicts in the evidence in favor of upholding the order. (See *Zaragoza, supra*, 1 Cal.5th at p. 44; *Nordin, supra*, 143 Cal.App.3d at p. 543.) Under this standard, the evidence would be more than sufficient to sustain White's conviction of the charged offenses—even if a reasonable jury, viewing the evidence differently, would be justified in acquitting him.

### III

The second requirement, that the court find by "clear and convincing evidence that there is a substantial likelihood the person's release would result in great bodily harm to others[,]" has not been defined in prior authorities. The parties have not cited, and our

10

research has not found, any published opinions discussing its meaning.  We will therefore consider the issue here.

Historically, with the exception of capital cases, bail was available to a defendant without regard to his threat to public safety.  (*In re Underwood* (1973) 9 Cal.3d 345, 349–350.)  The former provisions of the California Constitution prohibited applying a public safety exception to the general right to reasonable bail.  (*Id.* at p. 351.)  In adopting the exception at issue here, and its companion "threat" exception, the electorate abrogated the prior rule.  "In 1982, the voters were presented with a ballot measure proposing an amendment of article I, section 12 to allow courts to deny release on bail in the interest of public safety."  (*People v. Standish* (2006) 38 Cal.4th 858, 892 (conc. & dis. opn. of Chin, J.); see *id.*, at p. 875 (maj. opn. of George, C.J.).)

Statutory enactments confirm this focus on public safety.  Section 1275 provides, in relevant part, "In setting, reducing, or denying bail, a judge or magistrate shall take into consideration the protection of the public, the seriousness of the offense charged, the previous criminal record of the defendant, and the probability of his or her appearing at trial or at a hearing of the case.  The public safety shall be the primary consideration."

(§ 1275, subd. (a)(1).)[4] "In considering the seriousness of the offense charged, a judge or magistrate shall include consideration of the alleged injury to the victim, and alleged threats to the victim or a witness to the crime charged, the alleged use of a firearm or other deadly weapon in the commission of the crime charged, and the alleged use or possession of controlled substances by the defendant." (§ 1275, subd. (a)(2).)

These statutory factors must be considered with an eye toward the ultimate determination set forth in the California Constitution: whether there is "clear and convincing evidence that there is a substantial likelihood the person's release would result in great bodily harm to others." (Cal. Const., art. I, § 12, subd. (b).) The seriousness of a charged offense involving interstate financial fraud might, for example, be directly relevant to the amount of reasonable bail (see *People v. Amata* (1969) 270 Cal.App.2d 575, 584–585), but it would be less relevant to the court's assessment of likelihood of great bodily harm to others if the defendant were released. Similarly, the likelihood of a defendant showing up for future hearings or trial is directly relevant to the amount of reasonable bail, but it is relevant to the consideration of the likelihood of great bodily

---

[4]    Similar factors have appeared in the California Constitution since 1982. (Former Cal. Const., art. I, § 28, subd. (f)(3), added by initiative, Primary Elec. (June 8, 1982).) Our Supreme Court previously held that they did not go into effect when initially approved because a competing initiative, which added the exception to the right to bail at issue here, garnered more votes at the same election. (*People v. Standish, supra*, 38 Cal.4th at p. 877; *In re York* (1995) 9 Cal.4th 1133, 1140, fn. 4 (*York*).) In 2008, however, the electorate approved an initiative constitutional amendment that included the factors at issue here, with an added emphasis on the safety of victims. (Cal. Const., art. I, § 28, subd. (f)(3), amended by initiative, Gen. Elec. (Nov. 4, 2008).) Because our analysis in this opinion would not change based on consideration of these factors, we need not consider the effect of the 2008 amendment on California's bail system.

harm to others only if the defendant's failure to appear would somehow increase the likelihood of such harm.

Most relevant to the constitutional determination is evidence of violence or infliction of bodily harm in the defendant's criminal record or in connection with the charged offenses. Completed acts, attempts, and threats are all relevant to the court's inquiry. A court should be particularly attuned to facts that indicate whether past instances of violence or bodily harm were isolated events or would be expected to recur if the defendant were released on bail.

In order to deny bail, the trial court must find a "substantial likelihood" that the defendant's release would result in great bodily harm to others. (Cal. Const., art. I, § 12, subd. (b).) This standard requires more than a mere possibility, and it cannot be based on speculation about the general risk to public safety if a defendant is released. Great bodily harm to others must be a substantial likelihood. While the term "cannot . . . be reduced to a rigid formula susceptible to mechanical application" (*Nordin, supra*, 143 Cal.App.3d at p. 543), we observe that the standard requires more than simply a violent history. The

13

trial court must be convinced that future violence amounting to great bodily injury is substantially *likely* if the defendant were released on bail.[5]

Importantly, the trial court must make its finding of substantial likelihood by clear and convincing evidence. (Cal. Const., art. I, § 12, subd. (b).) " ' "Clear and convincing" evidence requires a finding of high probability.' [Citation.] The evidence must be ' "so clear as to leave no substantial doubt"; "sufficiently strong to command the unhesitating assent of every reasonable mind." ' " (*Nordin, supra*, 143 Cal.App.3d at p. 543; see *In re Angelia P.* (1981) 28 Cal.3d 908, 919.) As the trial court here recognized, it will be the "rare" and "unusual" case where a court is able to make this finding.

Although the parties do not directly address it, an important threshold question in this proceeding is the proper standard for our review. As the foregoing discussion shows, the court's finding on this element is essentially factual. The court must weigh the evidence, make credibility determinations, resolve evidentiary conflicts, and ultimately make a factual finding regarding whether there is a substantial likelihood the defendant's release would result in great bodily harm to others. As such, we apply the substantial

---

5       At oral argument, White contended that our interpretation of the constitutional standard should be informed by the presumption of innocence. But that presumption is a doctrine to be applied at trial; it has no application to the rights of a pretrial detainee. (*Bell v. Wolfish* (1979) 441 U.S. 520, 533; *York, supra*, 9 Cal.4th at p. 1148.) In fact, in bail proceedings, the historical rule has been that the defendant is presumed *guilty* after indictment. "[E]xcept for the purpose of a fair and impartial trial before a petit jury, the presumption of guilt arises against the prisoner upon the finding of an indictment against him." (*Ex parte Ryan* (1872) 44 Cal. 555, 558; see *Ex parte Duncan* (1879) 53 Cal. 410, 411.) This presumption appears to be reflected in the language of the constitutional requirement that the facts must be evident or the presumption—of guilt—great. (See *In re Application of Westcott* (1928) 93 Cal.App. 575, 576.)

14

evidence standard of review. (See *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 ["When the trial court has resolved a disputed factual issue, the appellate courts review the ruling according to the substantial evidence rule."].) The rationale behind this standard is clear. The trial court is better positioned to weigh the evidence and make credibility determinations; "we have nothing but the cold, unadorned words on the pages of the reporter's transcript." (*Escobar v. Flores* (2010) 183 Cal.App.4th 737, 749.) "The cold record cannot give the look or manner of the witnesses; their hesitations, their doubts, their variations of language, their precipitancy, their calmness or consideration. A witness may convince all who hear him testify that he is disingenuous and untruthful, and yet his testimony, when read, may convey a most favorable impression." (*Maslow v. Maslow* (1953) 117 Cal.App.2d 237, 243.) The trial court is better positioned to assess the weight and credibility of the evidence. Our deference is therefore appropriate.[6]

---

[6] We disagree with *Nordin, supra*, 143 Cal.App.3d at page 543, to the extent it holds that independent review is appropriate. To justify independent review, *Nordin* cites *In re Hochberg* (1970) 2 Cal.3d 870, 874, footnote 2, which discusses general procedural issues applicable to petitions for habeas corpus. *Hochberg* explains that when an appellate court issues an order to show cause returnable in superior court and the petitioner challenges the superior court's decision, "the reviewing court will make its independent examination and appraisal of the evidence that was taken in the superior court." (*Ibid.*) *Hochberg* does not speak to the myriad other situations where habeas review arises and other standards are used. We likewise do not believe that review for abuse of discretion is appropriate. Although the trial court's decision regarding the *amount* of bail is discretionary (*In re Christie* (2001) 92 Cal.App.4th 1105, 1107), the decision to remand a defendant without bail depends on a specific factual showing. We review this factual showing for substantial evidence.

As discussed above, our review for substantial evidence is limited in scope. We must view the record in the light most favorable to the court's order, presume the existence of every fact the court could reasonably have deduced from the evidence, and resolve any conflicts in the evidence in favor of upholding the order. (*Zaragoza, supra*, 1 Cal.5th at p. 45.) And, while reasonable inferences based on the evidence will support the court's order, unreasonable inferences or speculation will not. " 'While substantial evidence may consist of inferences, such inferences must be "a product of logic and reason" and "must rest on the evidence" [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citations.].' " (*Kasparian v. County of Los Angeles* (1995) 38 Cal.App.4th 242, 260; see *People v. Morris* (1988) 46 Cal.3d 1, 21.)

While the trial court must be satisfied that the evidence supporting its finding is clear and convincing, we do not make the same determination. "That standard was adopted . . . for the edification and guidance of the trial court, and was not intended as a standard for appellate review. 'The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal.' " (*Crail v. Blakely* (1973) 8 Cal.3d 744, 750; see *In re Mark L.* (2001) 94 Cal.App.4th 573, 580–581.) The ultimate question for a reviewing court is whether any reasonable trier of fact could have made the challenged finding by clear and convincing evidence. (See *Zaragoza, supra*, 1 Cal.5th at p. 45.)

16

Based on the record, the trial court could reasonably have inferred that Owens did not act alone, that White and Owens considered and planned the attack on J.D. over an extended period of time, that White acted as Owens's lookout and encouraged him to continue the attack after J.D. initially fought him off, and that White facilitated Owens's flight from the scene by driving him quickly away. The trial court could have found persuasive J.D.'s interpretation of White's statement, "[g]et in the house," as directed to Owens and encouraging him to continue the attack out of public view. Based on the circumstances of the attack, the court could reasonably infer that Owens and White were highly dangerous. Their attack was deliberate, it occurred during the day on a heavily trafficked street, and it targeted a vulnerable stranger. They worked in concert to increase the odds of the attack's success. And although the attack was not completed, the trial court could reasonably infer that Owens intended to rape J.D., a devastatingly harmful injury, and White knew it.

Although such an attack can never be fully explained, the facts show no reason why J.D. in specific was targeted. The criminal intent that led to the attack could apply to any stranger. The trial court could therefore reasonably infer that White would likely attack again, either alone or in concert with another, if released on bail.

We acknowledge that White did not have a criminal record, he had established positive relationships with other individuals in his life, and he denied the allegations against him formally and in interviews with police. The charged offenses alleged violence against a single person, and they did not in fact result in great bodily harm.

17

Viewed as a whole, and even given our deferential standard of review, this record tests the bounds of what would sustain an order remanding a defendant without bail under the California Constitution. But, after thorough consideration, we conclude the evidence is sufficient to support the remand order here. The trial court could reasonably find that White acted so brazenly, so inexplicably, and so without regard for the laws and norms of society that there would be a substantial likelihood that his release would result in great bodily harm to others.

The trial court here found a substantial likelihood of great bodily harm to J.D. specifically and to other children in general. Because the record supports the trial court's finding that White's release would result in great bodily harm to others, we need not consider whether the evidence supported a finding of great bodily harm to J.D. specifically.[7] As explained above, based on the testimony of J.D. and the statements of others who observed White and Owens, the court could reasonably find that White and Owens deliberated over the attack over an extended period of time, that White agreed to act as a lookout during the attack, that White encouraged Owens to continue attacking J.D. by telling him to "[g]et in the house" even after she fought Owens off, and that White facilitated Owens's flight after the attack occurred. In addition to these facts, the court could reasonably view the circumstances of the attack as highly unusual. Owens

---

[7] We note, however, that there was no evidence J.D. was specifically targeted or that she remained specifically under threat. Instead, the record shows that the risk of great bodily harm caused by White's release is to strangers, rather than a specific person known to White.

18

and White loitered on a well-trafficked street near the beach while watching J.D. It was daytime. People passed by, including one surfer who talked with J.D. Unrelated witnesses saw Owens and White, described them as "creepy," and worried that they would kidnap children. Despite the likelihood that someone would see them, they perpetrated a brazen attack on J.D.—and White specifically wanted the attack to continue. The trial court could reasonably find that the criminal impulse shared by Owens and White was so strong that White, either alone or in concert with another, would attack again if he were released. The evidence therefore supports the trial court's finding that there would be a substantial likelihood that White's release would result in great bodily harm to others.

White claims that his role was "limited" and the crime was "spontaneous." But the trial court could have reasonably found the opposite, as we discuss above. White argues that his statements to police were exculpatory, but the trial court could reasonably have found that White was not credible and was intent on minimizing his responsibility for the crime. The court could instead have inferred from White's admissions that he knew more

about Owens's actions than he acknowledged.  White has not shown that the evidence did

not support the court's order.[8]

---

[8]     Relying on *United States v. Salerno* (1987) 481 U.S. 739 (*Salerno*) and the recent
opinion in *In re Humphrey* (2018) 19 Cal.App.5th 1006 (*Humphrey*), White appears to
contend that the trial court was required to make a finding that no bail conditions or
combination of bail conditions would be sufficient to protect public safety before
ordering remand.  We disagree.  *Salerno* considered the constitutionality of a recently
enacted federal bail statute, which allowed pretrial detention without bail under certain
circumstances.  (*Salerno,* at p. 741.)  *Salerno* found the statute constitutional:  "When the
Government proves by clear and convincing evidence that an arrestee presents an
identified and articulable threat to an individual or the community, we believe that,
consistent with the Due Process Clause, a court may disable the arrestee from executing
that threat."  (*Id.* at p. 751.)  Although the statute requires a federal trial court to find that
"no condition or combination of conditions will reasonably assure the appearance of the
person as required and the safety of any other person and the community" before a
defendant may be detained without bail, it does not apply to state court proceedings.  (18
U.S.C. § 3142(e)(1); *Salerno*, at p. 742.)  And *Salerno* did not imply that such a finding is
required in state courts as a matter of federal constitution law.  White has not shown it
must be applied here.  *Humphrey* considered whether and under what circumstances a
trial court could constitutionally impose a bail requirement that exceeded a defendant's
ability to pay.  (*Humphrey,* at pp. 1015–1016.)  It held that "a court which has not
followed the procedures and made the findings required for an order of detention must, in
setting money bail, consider the defendants ability to pay and refrain from setting an
amount so beyond the defendant's means as to result in detention."  (*Id.*, at p. 1037.)  If
the court finds that it must impose money bail in excess of the defendant's ability to pay,
it must consider whether there are any less restrictive alternatives that would ensure his or
her future court appearances.  (*Ibid.*)  Here, because the court did follow the procedures
and make the constitutional findings required for an order of detention, and did not set
money bail, *Humphrey* is inapposite.

DISPOSITION

The petition is denied.

BENKE, Acting P. J.

WE CONCUR:

NARES, J.

IRION, J.