Filed 12/15/22 In re J.M. CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>C.M.,<br><br>　　　Defendant and Appellant. | A166064<br><br>(San Francisco Super. Ct. No. JD203152) |

In this appeal, Cas. M. (Mother), the mother of Jayla M., C.M. and N.J., appeals from orders of the juvenile court terminating her reunification services regarding Jayla and returning Jayla to her father under the Agency's supervision.

Mother argues the juvenile court erred for lack of substantial evidence in finding that she received reasonable services that addressed her mental health needs and reasonable visitation regarding Jayla. Because substantial evidence supports the juvenile court's findings, we affirm.[1]

---

[1] The court also ordered Mother's family reunification services terminated regarding C.M. and N.J. and scheduled a hearing under Welfare and Institutions Code section 366.26 for those cases. In an unpublished opinion, *C.M. v. Superior Court of San Francisco* (Nov. 28, 2022, A165962, A165973), we denied mother's writ petitions regarding C.M. and N.J. for essentially the same reasons as those we discuss here.

1

# I. BACKGROUND

In June 2020, the San Francisco Human Services Agency (Agency) filed two petitions under Welfare and Institutions Code[2] section 300, alleging under section 300, subdivisions (b)(1), (c) and (g) that all three of Mother's children—Jayla M., then 7 years old, C.M., then eight years old, and N.J., then three years old—had suffered, or were at substantial risk of suffering, serious physical harm or illness and serious emotional damage, and were left without any provision for support.[3]

## A. *The Agency's June 2020 Detention Report*

In its detention report, the Agency wrote that on June 15, 2020, Mother, with her children present, assaulted her partner, S.J., at a San Francisco shelter where they were staying. Mother threw a bottle at S.J. and hit her in the head with it, placed her knee on S.J.'s throat and choked her. Police arrested her, and the children, left without a caregiver, were detained. They were later put in the care of her sister, M.B., in Contra Costa County. The Agency listed two men as Jayla's alleged father, including Alexis G. Mother's sister said her father's whereabouts were unknown.

The Agency received reports that Mother "had previous incidents with police involvement" at the shelter. Also, there had been six referrals between 2012 and 2020 alleging her general neglect of children that were evaluated out or found to be inconclusive or unfounded, and in 2012 concerns were expressed about her mental health. Jayla and N.J. did not comment on the latest incident. C.M. told the Agency she did not see Mother hit anyone but had seen her get into arguments and " 'yell and scream,' "which scared C.M.

---

[2] Statutory references are to the Welfare and Institutions Code.

[3] The fathers of C.M. and N.J., who are different than Jayla's father, are not subjects of this appeal.

M.B. said Mother had "a history of pushing her family away and making choices that impact[ed] her and her family," had a temper, and argued too much with people on the street.

**B. *The Restraining Order Issued Against Mother***

In August 2020, M.B., through minors' counsel, requested a restraining order to keep Mother away from Mother's children, M.B., and M.B.'s daughter. M.B. alleged that Mother, in front of the children, had threatened to take the children away without permission and to "shoot" M.B. and "put her in a box." The court issued a temporary restraining order as requested, except it allowed Agency-supervised visits with the children, and issued a virtually identical interim order in December 2020, noting that "currently the children do not want to visit with the mother." It granted the restraining order in March 2021, again with essentially the same provisions, ordering Agency-supervised visitation when the children were "ready to visit" with Mother.

In November 2021, the court modified its March 2021 restraining order. It prohibited Mother from harassing the children, M.B., or M.B.'s daughter, but allowed her to contact them "for brief peaceful contact for court ordered visitation of children," which were to be Agency-supervised unless the Agency determined they could be unsupervised.

**C. *The March 2021 Jurisdictional and Dispositional Hearing***

The court held a jurisdictional and dispositional hearing in March 2021. The Agency's September 2020 disposition report stated that Mother had difficulty maintaining her appointments and was mainly focused on finding housing; she was unemployed and homeless, having been asked to leave the shelter after her arrest and the children's detention. She denied having a history of mental health problems. Jayla and C.M. did not want to have visits with her.

The Agency reported that Alexis G. had been named Jayla's alleged father. Alexis (hereinafter, Father) told the Agency that he had tried to be in Jayla's life before, but Mother had not allowed it. When M.B. contacted him and told him Jayla was in foster care, he started having supervised phone calls with her, which both reportedly enjoyed. Jayla indicated she wanted to have phone calls with Father. Father was living with family members in Fairfield, California, and was planning to relocate to Las Vegas, Nevada, having lost his job due to the COVID-19 pandemic.

The Agency wrote that Mother had suffered trauma from being in a domestic violence-prone relationship, the murder of N.J.'s father, the removal of her children, and childhood trauma. She was connected with a therapist, but it was "challenging" for her to participate in therapy because she was focused on obtaining housing.

The Agency further reported that it was "challenging" to work with Mother because she did not think her children should have been removed, minimized the domestic violence, and did not understand its impact on her children. She often became easily upset and angry and her threats to M.B. were concerning. The Agency proposed a reunification plan that required her to "[p]articipate in individual therapy to learn how to manage her anger and process her trauma," "[p]articipate in a domestic violence assessment and follow the recommendations for support," "[p]articipate in a parenting class," "[s]ecure safe and stable housing," and "[p]articipate in therapy with the children if deemed necessary by the therapist."

The Agency also proposed a reunification plan for Father. It required that he "demonstrate he can have custody of Jayla by ensuring he is able to provide Jayla with a safe and stable home," which included that he "maintain

4

regular contact with Jayla to build a relationship and support her" and "ask Jayla about her school and participate in therapy if necessary."

Shortly before the March 2021 jurisdictional and dispositional hearing, the Agency submitted an addendum report, writing that the children did not want to return to Mother's care and that Jayla and C.M. did not want to participate in any visits with her. Mother had had "limited to no contact" with the Agency despite numerous attempts to contact her since late October 2020. She had not participated in therapy to address her trauma and anger, nor in domestic violence services. She recently created a scene with M.B. with the children present, and then called and harassed M.B. until M.B. blocked her.

The Agency also reported that paternity testing established that Father was Jayla's biological father. Father continued to have "consistent contact" with Jayla via telephone calls and visits. The Agency's social worker on the case communicated well with Father, who said he would like to have Jayla live with him. Although he had previously indicated he planned to move to Las Vegas, his new goal was to stay in the Bay Area. He was working to secure employment and stable housing. In March 2021, the court declared Father to be Jayla's presumed father.

At the March 2021 jurisdictional and dispositional hearing, Mother and Father submitted to the allegations stated by the Agency in an amended section 300 petition. The court found under section 300, subdivision (b) that Jayla and the other two children had suffered or faced a substantial risk of suffering serious physical harm or illness as a result of their parents' failure or inability to protect them adequately, or to provide them with regular care due to mental illness, developmental disability, or substance abuse. The court found that the children "were left without a custodial parent when the

5

mother was arrested for domestic violence" and were "at risk of physical and emotional harm" due to the June 15, 2020 incident, and that Mother had "anger management issues requiring assessment and treatment." It also found under section 300, subdivision (g) that the children had been left without any provision for support as a result of Mother's arrest.

The court adopted the Agency's proposed case plan for Mother, ordering Agency-supervised therapeutic visits with her when the children were "ready." It also adopted the Agency's proposed case plan for Father.

## D. *Further Reunification Efforts*

The juvenile court held a combined, contested six-month, 12-month, and 18-month status review hearing in August 2022 (contested status review hearing). Before then, the court received multiple reports and granted multiple hearing continuances.

### 1. **The Agency's Six-Month Status Review Report**

In its August 2021 six-month status review report, the Agency wrote that it had referred Mother to a therapy provider and she appeared eager recently to begin therapy. Her domestic violence support provider "reported it was difficult to connect with [Mother] because she is not open to talking about the domestic violence."

As for the children's therapy, the Agency reported that in two initial CANS[4] screenings, Jayla was found not to meet medical necessity for therapy. The reporting Agency social worker advocated for Jayla to be reassessed earlier than planned and an updated CANS assessment was completed. Jayla was found to meet medical necessity, being at risk for " 'Deterioration of Functioning' " based on her current mental health

---

[4] CANS stands for Child and Adolescent Needs and Strengths. (*In re Daniela G.* (2018) 23 Cal.App.5th 1083, 1088.)

combined with the history of the case. Due to COVID-19 constraints and a staffing shortage, Jayla was on a waiting list with a therapy provider. The reporting Agency social worker planned to follow up with another service provider in the hope of referring Jayla for individual therapy there, and the Agency was seeking the rescission of the existing waiver of presumptive transfer of Jayla's mental health plan so she could have access to more services in Contra Costa County.

Similarly, although C.M. was found in her initial CANS assessment not to meet medical necessity, she was, with the Agency's help, reassessed and put on a therapy waiting list. The Agency also was seeking the rescission of the existing waiver of presumptive transfer of her mental health plan. N.J. also was initially assessed not to need therapy but was reassessed and linked to therapy. None of the children were in therapy yet because of the time needed to obtain their reassessment, the new COVID-19 guidelines, their placement in Contra Costa County, and service providers being short-staffed.

Also, the Agency reported, "[t]here have been numerous efforts to start supervised visits with the mother, but . . . [e]ach time the mother reports she is not going to engage in the visits." The Agency did not recommend family therapy because no one had started therapy and, additionally, C.M. did not want to engage in family therapy.

Mother said she was staying with her grandfather in Pinole and looking for housing outside of San Francisco to get away from her "old life." The Agency was helping her look for housing.

Father had temporarily relocated to Las Vegas to search for housing and employment and hoped to bring Jayla there. The Agency had referred him and Jayla to "Bringing Families Home," where they were on a waiting list. The Agency had no current mental health concerns about Father. He

7

said he would engage in family therapy with Jayla if recommended by her therapist. He was actively engaged in visits and regular contact with Jayla. He had not yet begun parenting classes to which the Agency had referred him.

The Agency recommended that Mother's reunification services be terminated. It concluded that reunification was unlikely because of her failure to engage in recommended services or start supervised visits, and her conflicts with M.B. It recommended an additional six months of reunification services for Father.

## 2. The Agency's October 2021 Addendum Report

In an October 2021 addendum report, the Agency reported that Mother had shown a change of attitude and reported "being very committed to her reunification services and starting visits." She had started a new job and said she had completed a parenting class (which the Agency later confirmed). She had not connected with her case manager nor started supervised visits. The Agency still recommended termination of her reunification services.

The Agency continued to recommend six more months of reunification services for Father, who continued to say he was committed to reunifying with Jayla. His girlfriend also said she was committed to supporting him in the transition to reunification.

The Agency further reported that Jayla and C.M. had reached the top of the waiting list they were on for therapy support, but that M.B. could not commit to bringing them to therapy because of the travel involved. The Agency was searching for other community support. N.J. was assigned a therapist and his therapy would begin after the Agency evaluated the possible need for a change in his caregiver placement.

### 3. The Agency's 18-Month Status Review and Addendum Report

In a December 2021 18-month status review and addendum report, the Agency wrote that Mother "demonstrated a change in her behavior by engaging in services and working to create a new start for her family." The Agency had provided her with an updated referral for individual therapy and medication evaluation in August 2021, but she had yet to sign a release needed to determine her participation. Mother had received a domestic violence " 'low risk' " assessment, had agreed to participate in one-on-one anger management counseling twice a month, and was to participate in a women's anger management class.

The Agency reported about the modified restraining order, that in July 2021 a visitation coordinator reported that Mother was not going to participate in visits, and that in September 2021 Mother requested visitations. The Agency had since been working with her to arrange weekly virtual visitations that were to start on December 2, 2021, with supervised in-person visits also to be coordinated.

Mother was living with a family friend in Oakland and continuing to work. She was looking for housing outside of San Francisco, and the Agency continued to try to help her find housing.

Father was staying in San Pablo, California, while looking for housing, with the help of a Bringing Families Home case manager and the Agency. He reported that he had completed a parenting program three years before, but the Agency had no knowledge that he was participating in any current program.

Regarding the children's therapy, there was no additional progress or information to report regarding Jayla. C.M. remained on a therapy waiting list. The Agency had requested virtual therapy for her and continued to look for other options. N.J.'s placement had changed, delaying the beginning of

9

his therapy. Since no one had begun therapy, family therapy was not recommended. The Agency continued to recommend termination of Mother's reunification services, and it recommended termination of services for Father in light of his failure to complete a recent parenting program and his lack of housing.

### 4. The Progress Report Hearings

At a December 2021 hearing, the court continued the contested status review hearing to March 2022 at the parties' joint request because Mother had started participating in services. Mother's counsel expressed concerns that neither visitations, which Mother first requested in September 2021, nor the children's therapy had started, and asked for more frequent court review. The Agency social worker said Jayla and C.M. did not want to participate in therapy but that N.J. was starting his, that virtual visits were set up for Thursdays, and that the Agency was "actively working" on arranging in-person visits that met Mother's and the children's schedules. Everyone but C.M. was "on board" for the visits. The court scheduled a January 4, 2022 progress report hearing.

At the January 4, 2022 hearing, the Agency's counsel reported that the social worker on the case was on unexpected medical leave and so an update was not available. Father's counsel reported that Father remained committed to reunifying with Jayla, but had not found housing. Minors' counsel said C.M. did not want therapy. Mother's counsel reported that Mother was now in therapy but that in-person visits had not yet happened, and expressed her concern again about the failure to begin the children's therapy because it was needed to overcome their resistance to seeing Mother. She suggested a contempt action for the Agency's failure to provide in-person visits might be appropriate. The Agency's counsel apologized for the lack of visits and said he would emphasize the importance of the case to an Agency

10

supervisor. The court said that Mother had recently "stepped up," and that "there may be a reasonable services argument." It rejected the idea of a contempt action and scheduled another progress report hearing for January 20, 2022.

At the January 20, 2022 progress report hearing, the Agency's counsel reported that another social worker was now working on the case. An in-person visit had occurred, but COVID-19 exposures had caused a delay in further visits. The Agency, having obtained a waiver of presumptive transfer and intervention by the Agency's upper management, expected San Francisco clinicians to be identified that week. Mother's counsel said she and Mother remained concerned about the delay. The court opined that all parties had played a part in the delay and that "things [were] back on track." It said its goal was to return the children to Mother "when possible," to which the Agency's counsel agreed. The court continued the hearing to February 16, 2022, for another progress report.

At the February 16, 2022 hearing, the Agency's counsel reported that the children had met with therapists, but that visitations were delayed because of COVID-19 and a change in the children's placement. Mother said she had met with a psychiatrist and a doctor and was told there was no need to put her on medication, but that she had a past history of an anxiety problem and was prescribed hydroxyzine. She was seeing a domestic violence counselor as well. Her counsel said Mother had been assessed for therapy and it was not recommended at that time. Mother had visited twice with Jayla in person. C.M. had "softened some" and had "done a little FaceTiming" with Mother. Mother said she understood C.M. now wanted to go to therapy.

11

### 5. The Agency's February 2022 Addendum Report

In mid-February 2022, the Agency filed an addendum report for the then-scheduled March 2022 contested status review hearing. It wrote that in late January 2022, Mother said she was unaware she should be in individual therapy and was told to go for intake. She went, and later reported that she had seen a doctor who prescribed hydroxyzine for her anxiety, and that she was going to see the doctor twice a week. The doctor confirmed that he had seen Mother, but could not discuss her case further because Mother had not signed a consent form.

Mother's domestic violence support service provider reported that Mother was engaging in one-on-one counseling sessions, was forthcoming, understood the impact of domestic violence on the children and others, and took "full accountability" for her violent behavior. She was to start attending an anger management group soon.

The Agency had started supervising virtual visits between Mother and her children on December 2, 2021, and in-person visits on January 7, 2022. Between January 7, 2022 and February 11, 2022, only two of six scheduled in-person visits with Jayla and N.J. had taken place for a variety of reasons. C.M. still refused to visit with Mother. As of February 2, 2022, Jayla and C.M. had a new therapist in San Francisco, and N.J. was having weekly therapy sessions.

Mother remained employed and was now living with a cousin in Oakland. The Agency continued to recommend that her reunification services be terminated.

Father continued to seek housing with help from service providers. There were no mental health concerns about him. He had yet to participate in a current parenting class. He had the opportunity to visit Jayla every weekend, had last seen her at Christmas 2021, had sent money for a birthday

12

gift in January, and had not been visiting Jayla recently because of " 'family issues.' " The Agency was concerned about these inconsistent visits, and was encouraging Father to remain in regular contact with Jayla and attempt to visit her every weekend.

At the March 2022 contested status review hearing, the Agency's counsel said he agreed with Mother and minors' counsel that the children could go home with Mother if she had housing, which she did not have. At the Agency's request, the court continued the matter to afford Mother more time to look for housing.

### E. *The Section 387 Petition Regarding N.J.*

In July 2022, the Agency filed a section 387 petition asking that N.J. be detained in emergency shelter. It alleged that N.J.'s new caregiver left him with his paternal uncle for an overnight visit without Agency knowledge or permission and that the uncle, prodded by Mother's claims that the caregiver was not taking good care of N.J., refused for some time to reveal N.J.'s whereabouts or return him to his caregiver. In a detention report, the Agency reported that a social worker who spoke by phone with the caregiver could hear Mother yelling and hitting a car and windshield. Also, the social worker was told by Mother in a phone call on the day of the incident regarding N.J., "You are not getting him back, even if I have to take him out of state." The court later found the Agency's allegations to be true.

### F. *The Agency's July 2022 Second Addendum Report*

In a second addendum report prepared in July 2022, the Agency wrote that Mother had missed her last two appointments with her social worker. She said she had completed therapy intake in late June 2022, but the Agency had not confirmed it. Her domestic violence support provider was closing her case for nonattendance, having not had contact with her since March 2022, and Mother had not attended any anger management sessions. At the

13

Agency's request, she was accepted back into the domestic violence support program and instructed to complete a new intake appointment.

Also, Mother had had some unauthorized visits with the children. Nonetheless, she cancelled or did not show up for 13 of the 19 in-person visits with children that were scheduled between January 7, 2022 and June 3, 2022. On the weeks when Mother confirmed her visits but did not show up, both Jayla and N.J. were emotionally distraught. Mother was no longer employed but did not say why. She reported that she was living in Oakland " 'and other places.' " The Agency again recommended termination of her reunification services.

Father had recently moved into a two-bedroom apartment in Pinole, California, with the help of the Bringing Families Home program. The Agency had completed a safety check of the apartment and had approved Jayla spending nights there; Jayla had her first unsupervised weekend visit the weekend of July 2, 2022, and had her own bedroom there. Father recently told the Agency he "did not want to get involved with the [parenting] classes until he knew for sure that he would get custody of Jayla. He agree[d] to attend if he [was] awarded custody." He was calling Jayla nightly and visiting her two to three times a week. He was "eager" to have her move in with him, and Jayla wanted to live with him. The Agency recommended that Jayla be placed in Father's home under the Agency's supervision.

### G. *The July 2022 Court-Appointed Special Advocate Report*

Along with this updated report, Jayla's court-appointed special advocate (CASA) reported in July 2022 that she had visited Jayla about twice a month since December 2020, and had spent 70 hours directly with her. The advocate wrote, "Jayla has expressed disappointment and anger when the scheduled visits with her mother . . . have been cancelled. Jayla has mentioned that she would like to live with [Father]." However, Jayla loved

14

her school and its after-school program, and was very reluctant to change schools. She recommended that Jayla be placed with Father and family maintenance services be provided.

### H. *The August 2022 Contested Status Review Hearing*

In August 2022, the court held the contested status review hearing. The Agency again recommended that Mother's reunification services regarding Jayla be terminated and that Jayla be placed with Father under the Agency's supervision.

### 1. Testimony by the Agency Social Worker Assigned to the Case

The Agency social worker assigned to the case testified that Mother had not been cooperative with her for the last five or six weeks. Mother had been very angry and had written several emails accusing the social worker of things that were not true. Mother had done intake at a therapy clinic but had not followed through with any of her appointments, leading to the service provider closing her case. Her anger management support provider had recently closed her case because she had missed appointments. Mother had missed her last two scheduled visits with Jayla and N.J., saying she did not have transportation one week and not showing up the next.

C.M. had been engaging in therapy since February 2022. The social worker agreed that having C.M. wait from November 2020 until February 2022 for therapy services was not appropriate, and said the service provider "really failed to get a therapist in a timely manner." C.M. refused to visit with Mother, was not willing to have contact with her and did not want to participate in family therapy. She told the social worker she was very disappointed with Mother.

The social worker did not remember Mother requesting help managing her mental health, but did remember meeting monthly with her, going over the need for her to participate in mental health services and following up to see if she had done so; the social worker agreed that Mother's mental health was a concern in the case. She had given Mother two referrals for therapy and the prior social worker had given referrals. She had not offered to drive or go with her on an intake date. Also, Mother remained without housing.

### 2. Mother's Testimony

Mother testified that she was under a lot of mental stress at the time of the June 15, 2020 domestic violence incident because of the death of N.J.'s father. She had very good relationships with her children and C.M. had always been the closest to her. Jayla was "kind of off on the other end . . . ."

Mother had contacted supervisors at the Agency about help, mainly for her mental health. She "never had any anger issues," but did struggle with "depression from this situation that's going on" and did have anxiety. She got "a little anxious," but meant "no harm." She had not received mental health referrals from the Agency and had sought help on her own initiative. She needed help with her mental health and had "been saying it over and over and over." The testifying social worker had said her case had gone on too long, they were tired of it, and they just want to get rid of it.

### 3. The Court's Termination of Mother's Reunification Services

The court found by clear and convincing evidence that the Agency had made reasonable efforts to return Jayla to a safe home. Mother had made minimal progress towards alleviating or mitigating the causes necessitating Jayla's out-of-home placement. The court terminated Mother's reunification services and ordered Jayla returned to her father under the Agency's supervision. The court further ordered that Jayla attend her school of origin,

16

which C.M. also attended, and counsel indicated Father would ensure that happened.[5]  Mother filed a timely notice of appeal from the court's rulings.

## II. DISCUSSION

Mother argues that the juvenile court erred in finding that reasonable reunification services and visitation regarding Jayla were provided to her.

### A. *Relevant Legal Standards*

"The overarching goal of dependency proceedings is to safeguard the welfare of California's children.  [Citation.]  'Family preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced.  [Citation.] Reunification services implement "the law's strong preference for maintaining the family relationships if at all possible." ' " (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1228.)  Accordingly, with exceptions not relevant here, section 361.5 "requires the juvenile court to order child welfare services for both parent and child when a minor is removed from parental custody." (*In re Nolan W.*, *supra*, at p. 1228.)

"The purpose of [reunification] services is to resolve the problems that led to the dependency and thereby reunify the family." (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 589.)  "Reunification services must be 'designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300.' [Citation.]  Accordingly, a reunification plan must be appropriately based on the particular family's 'unique facts.' " (*In re T.G.* (2010) 188 Cal.App.4th 687, 696.)

Section 361.5 further provides that, depending on the circumstances, a juvenile court may order reunification services for up to a maximum of

_____

[5] The court also ordered Mother's family reunification services terminated regarding C.M. and N.J. and C.M.'s father's services regarding C.M.

17

18 months after the date of a child's removal. (§ 361.5, subd. (3)(A).) Upon a showing of good cause, the juvenile court may, under section 352, continue the 18-month review hearing and extend services for up to 24 months from the date of removal. (*In re J.E.* (2016) 3 Cal.App.5th 557, 564–566.)

A juvenile court may order a parent to participate in counseling or other treatment services as part of a reunification case plan. (§ 361.5, subd. (3)(B).) "[W]hen a parent or guardian has a mental illness . . . , that condition must be the 'starting point' for a family reunification plan which should be tailored to accommodate their unique needs." (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 420 (*Patricia W.*).)

The social service agency " 'must make a good faith effort to develop and implement a family reunification plan. [Citation.] "[T]he record should show that the [Agency] identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . ." ' " (*In re T.G., supra*, 188 Cal.App.4th at p. 697.)

"The ' "adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case." ' " (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1240 (*T.J.*).) " 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426.)

## B. *Standard of Review*

"The juvenile court's finding that reasonable services were provided is reviewed for substantial evidence. [Citation.] Substantial evidence is that which is reasonable, credible and of solid value." (*T.J., supra*, 21 Cal.App.5th

at p. 1238.)  Under this standard, "[w]e review the evidence most favorably to the Agency, which is the prevailing party, and indulge all legitimate and reasonable inferences to uphold the trial court's order." (*Patricia W.*, *supra*, 244 Cal.App.4th at p. 419.)  Because the juvenile court must find by clear and convincing evidence that reasonable services were provided in order to proceed to a section 366.26 hearing, we review the court's finding of reasonable services for substantial evidence of clear and convincing evidence. (*T.J.*, at pp. 1238–1239; § 366.21, subd. (g)(1)(C)(ii).)  "Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt.  [Citation.]  It must be ' " 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " ' " (*T.J.*, at p. 1238.)

### C. *The Court Did Not Err in Finding Mother Was Provided with Reasonable Reunification Services*

Mother first argues that her "mental health issues were never a starting point" for the Agency's reunification plan, "imped[ing] her ability to address aspects of her reunification plan, including domestic violence services and securing safe and stable housing."  Rather than focus on her mental health, "a critical component from the outset of this case, but no later than February 2022, when mother was prescribed hydroxyzine for her anxiety," the Agency "focused on other aspects of mother's case plan and did not modify the plan to address mother's mental health when the need became obvious in February 2022. . . . Moreover, no efforts were made to assure . . . that mother was complying with her prescribed medication."  "By overlooking mother's mental health issues—which were most certainly related to mother's ongoing challenge with controlling her emotions—the Agency failed to provide mother with reasonable reunification services."

19

Mother's argument ignores the substantial evidence that the Agency, from early in the case and continuing over the next year and a half, recognized Mother had mental health issues, made mental health services available to her and urged her to participate in these services, all despite her repeated lack of cooperation, failure at times to contact the Agency, and ongoing resistance to therapy. For example, early in the case, in September 2020, the Agency was already focused on Mother's mental health needs. It reported to the juvenile court that Mother had suffered various traumas, including in her childhood, and that she was connected with a therapist.

But Mother failed to attend to her mental health issues, the Agency reporting that it was challenging for her to participate in therapy because she was focused on obtaining housing and challenging to work with her because she minimized her domestic violence. In February 2021, the Agency reported that it had made many efforts to contact Mother, but that she had had "limited to no contact" with the Agency since late October 2020. She had not participated in therapy to address her trauma and anger, nor in domestic violence services.

The Agency's focus on Mother's mental health needs is reflected in its recommendations to the court. Also in September 2020, it recommended a reunification case plan, later adopted by the juvenile court, that included that Mother participate in individual therapy "to learn how to manage her anger and process her trauma" and a domestic violence assessment.

After the court's adoption of Mother's reunification case plan, Mother continued to resist beginning therapy and addressing her domestic violence. The Agency provided her with an updated referral for individual therapy and medication evaluation in August 2021, but Mother did not sign a release that would have allowed it to determine her participation.

Finally, in January 2022, Mother, only after the Agency again insisted to her that she had to be in therapy, saw a doctor who prescribed hydroxyzine for her anxiety. But even then, Mother did not sign a consent form that would have allowed the Agency to talk with her doctor about her mental health needs.

Also, contrary to Mother's contentions in this appeal, there is no evidence that she failed to take her medication after seeing this doctor, nor any evidence indicating that the Agency should have changed her case plan in early 2022 after the doctor prescribed hydroxyzine, particularly in light of Mother's report that she was going to see this doctor every two weeks, and a report that she was engaging in one-on-one counseling sessions about her domestic violence. Moreover, during the brief period that Mother was willing to engage in services in the first part of 2022, the Agency did in a sense alter its case plan by recommending that the juvenile court continue the contested status review hearing, which gave Mother more time to participate in therapeutic services. Sadly, she did not continue her participation and became uncooperative with the Agency once more.

Mother analogizes her circumstances to those in *T.J.*, *supra*, 21 Cal.App.5th 1229. There, this court held there was no substantial evidence that a mother who was intellectually disabled received reasonable services that addressed her special needs because she "was wait-listed for a significant time on critical components of her case plan—individual therapy, in-home counseling, and parenting education—and was provided no assistance with in-home support services, anger management or housing." (*Id*. at p. 1233.) Those circumstances are a far cry from those here, where the Agency continually provided Mother with referrals to available services that would address her mental health needs and urged her repeatedly to

21

participate in them, but Mother resisted participating until approximately 15 months after her children were removed from her care.

In short, Mother's contention that the Agency did not sufficiently address her mental health needs is belied by this ample evidence. Her claim that the court erred in finding that she received reasonable services because of the Agency's neglect of her mental health needs is without merit.

### D. *The Court Did Not Err in Finding Mother Was Provided with Reasonable Visitation Regarding Jayla*

Next, Mother argues that the court erred in finding that the Agency provided her with reasonable visitation regarding Jayla.[6]

"Visitation is a critical component, probably the most critical component, of a reunification plan." (*In re Lauren Z.* (2008) 158 Cal.App.4th 1102, 1113–1114.) "To promote reunification, visitation must be as frequent as possible. [Citation.] Where the minor is reluctant to visit, and family therapy is needed to promote visitation, such therapy may be critical to reunification." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972.)

Mother contends that the juvenile court impermissibly delegated to the Agency and Jayla unlimited discretion to determine whether visitation could occur, as the court ordered in March 2021 that Agency-supervised therapeutic visits could occur when the children were "ready to visit" with Mother. Mother refers to what she characterizes as Agency delays in providing Jayla individual therapy services until February 2022, contending those delays allowing Jayla improper discretion to decide when visitations occurred. As Mother points out, courts have held that visitation may not be limited in "the absence of evidence the parents' behavior has jeopardized or

---

[6] Although Mother does not identify a court finding that was specifically about visitation, we assume she asserts this as another part of her lack of reasonable services argument.

22

will jeopardize the child's safety." (*Patricia W.*, *supra*, 244 Cal.App.4th at p. 428, fn. 19.) She contends that the Agency had no reason to delay her in-person visits with Jayla until January 2022, and that, "[w]ith no therapy in place from March 2021 to February 2022, [Jayla] and her siblings effectively maintained total discretion to decide whether visitation with mother would occur."

Mother's arguments ignore the substantial evidence that the Agency provided Mother with reasonable visitation, in which Mother either refused to participate or which she undermined by conduct that endangered the children's safety. Mother repeatedly engaged in aggressive physical or verbal behavior in the children's presence. Her attack on S.J. initiated this case, and Mother's threat to "shoot" M.B. and "put her in a box" in the presence of her children, including Jayla, resulted in the court's issuance of a restraining order from August 2020 to November 2021 that prohibited her from contacting her children other than for Agency-supervised visitation. It is reasonable to infer that these events contributed to the unwillingness of Jayla to visit with Mother, not any Agency failure to provide Mother with reasonable visitation opportunities.

Further, the record shows that Mother indicated in mid-2021, soon after the court adopted her case plan, that she was *not* going to participate in visits. When she did request visitation in September 2021, the record indicates the Agency worked diligently to arrange them, grappling with Mother's work schedule and the children's school schedules, COVID-19, and the change in placement for the children. Virtual visits began in early December 2021 and in-person visits began in January 2022.

There was some delay from September to January in arranging in-person visits, apparently exacerbated by the unexpected medical leave

taken by the social worker on the case.  But again, "[t]he ' "adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case." ' " (*T.J.*, *supra*, 21 Cal.App.5th at p. 1240.)  " 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*Tracy J. v. Superior Court*, *supra*, 202 Cal.App.4th at p. 1426.)  Also, the Agency provided many visitation opportunities for Mother with Jayla in 2022 during the extended time she had to participate in reunification services, but she cancelled or did not show up for 13 of the 19 in-person visits scheduled between January 7, 2022 and June 3, 2022.  The Agency and Jayla's CASA special advocate reported that Jayla was upset when scheduled visits with Mother were cancelled.  There is no indication in the record Mother missed these visits for lack of services provided by the Agency.

In sum, Mother's contention that the juvenile court erred in finding that she had reasonable visitation regarding Jayla is also without merit.

## III. DISPOSITION

The orders appealed from are affirmed.

STREETER, J.

WE CONCUR:

POLLAK, P. J.
BROWN, J.

24